619 F.2d 231
 15 ERC 1394, 10 Envtl. L. Rep. 20,235
 SUSQUEHANNA VALLEY ALLIANCE, Davis, Ronald L., Tompkins,
Betty, Hess, Beverly M., Snell, Doreen E., Appellants,
v.
THREE MILE ISLAND NUCLEAR REACTOR, General Public Utilities,
Metropolitan Edison Company, Jersey Central Power & Light
Co., Pennsylvania Electric Co., Nuclear Regulatory
Commission, Hendrie, Joseph A., Dieckamp, Herman, Creitz,
Walter M., Verrochi, W. A., Bartnoff, Shepard, Appellees.
 No. 79-2446.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 13, 1979.
Decided March 17, 1980.
 
 Albert J. Slap (argued), Public Interest Law Center of Philadelphia, Philadelphia, Pa., Jean Royer Kohr, Minney, Mecum & Kohr, Lancaster, Pa., Larry B. Selkowitz, Widoff, Reager, Selkowitz & Adler, Camp Hill, Pa., for appellants.
 George F. Trowbridge, Mark Augenblick, Thomas A. Baxter (argued), Shaw, Pittman, Potts & Trowbridge, Washington, D. C., for private appellees.
 Leonard Bickwit, Jr., Gen. Counsel, Stephen F. Eilperin (argued), Sol., E. Leo Slaggie, Stephen S. Ostrach, Attys., U. S. Nuclear Regulatory Commission, Washington, D. C., Sanford Sagalkin, Acting Asst. Atty. Gen., Peter R. Steenland, Jr., Chief, Appellate Section, Jacques B. Gelin, Atty., Land and Natural Resources Division, U. S. Dept. of Justice, Washington, D. C., for appellee Nuclear Regulatory Commission.
 Before GIBBONS, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 The Susquehanna Valley Alliance, an unincorporated association of residents of Lebanon, York, and Lancaster Counties in the Commonwealth of Pennsylvania dedicated to preservation of the environment of the Susquehanna River, and four Lancaster County residents, (collectively the Alliance) appeal from an order dismissing their complaint seeking injunctive and declaratory relief for lack of subject matter jurisdiction. We conclude that the complaint states some claims over which the district court has jurisdiction, and we will reverse.
 
 I. Proceedings in the District Court
 
 2
 The defendants are the Nuclear Regulatory Commission (NRC), Joseph A. Hendrie, its Chairman, General Public Utilities and several of its subsidiaries, who own and operate Unit 2 of the Three Mile Island Nuclear Power Station at Middletown, Dauphin County, Pennsylvania (collectively the Operators) and several officers of the Operators. The complaint alleges, and it is conceded by all parties, that on March 28, 1979, an accident at Unit 2 made it necessary to bring that Unit to a cold shutdown, and that as a result of the shutdown 600,000 gallons of water, contaminated by a high level of radioactive waste, have accumulated in the reactor containment building and 250,000 gallons of water contaminated by an intermediate level of radioactive waste have accumulated in the Unit's auxiliary building and associated tanks.[1] The complaint alleges that the defendants have planned an attempt to partially decontaminate the water and threaten to release this water eventually into the Susquehanna River, where because of the proposed decontamination system's technological limitations it will contaminate both municipal water systems and fish and other wildlife used by the plaintiffs for food. More specifically, the complaint alleges that NRC has authorized the Operators to purchase, erect, and begin the operation of a system, known as Epicor II, for treatment of contaminated water. The system will decontaminate the water by passing it through resin beds in which isotopes other than hydrogen and oxygen will bind to the resin, while the decontaminated water will be discharged. Thus, the radioactive isotopes will be trapped in resin beds while the non-binding hydrogen and oxygen will be discharged.[2] The complaint alleges that there is no known technology available to maintain the integrity of the resin beds and that if they disintegrate radioactive waste materials will be discharged into the river or the air. While the Operators propose to treat only the intermediate level radioactive water by means of the Epicor II system, that water is alleged to contain "high-level radioactive waste" within the meaning of section 301(f) of the Federal Water Pollution Control Act (FWPCA),[3] which prohibits discharge of such waste into the navigable waters of the United States. Moreover, the complaint alleges, neither the Operators nor the NRC have any overall plan to deal with the entire contaminated water problem, or any feasible plan for disposal of the highly radioactive resin residue which Epicor II will produce. Finally, it is alleged that because the containment building and the auxiliary building are presently secure there is no immediate necessity for putting the Epicor II system into operation.
 
 
 3
 Jurisdiction is invoked pursuant to 28 U.S.C. §§ 1361, 1331, and 1337 as well as 33 U.S.C. § 1365(a)(2) and 5 U.S.C. §§ 704, 706. The complaint alleges the jurisdictional amount required by 28 U.S.C. § 1331. Plaintiffs' complaint charges that the actions and inactions of the NRC and the actions of the Operators have given rise to four substantive claims. Count I charges violations of section 102 of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321-4361, 4332 (1976), and of a provision of the Operators' operating license requiring that the licensee, before engaging in additional construction or operational activity, prepare and record an environmental evaluation of such activity. Count II charges violations of various provisions of the Atomic Energy Act, 42 U.S.C. §§ 2011-2296 (1976 & Supp. I), regulations of the NRC issued pursuant to that Act, and the Operators' license. Count III charges violations of section 301(f) of the Federal Water Pollution Control Act, 33 U.S.C. § 1311(f). Count IV alleges that the action of the NRC permitting the Operators to discharge radioactive waste violates plaintiffs' rights under various provisions of the United States Constitution.
 
 
 4
 The district court, without separately analyzing the four Counts of the complaint, concluded that the relief requested was unavailable from any source other than the NRC, that the plaintiffs had failed to exhaust administrative remedies before that agency, and that the court lacked subject matter jurisdiction. The complaint thus was "dismissed for lack of subject matter jurisdiction, but without prejudice to plaintiffs' right of recourse to the (NRC)."[4] Since the order appealed from dealt only with whether the complaint stated any cause of action within the subject matter jurisdiction of the district court, we must first consider that question with respect to each count.[5] Although the complaint pleads the violation of the National Environmental Policy Act of 1969 as the first Count, we think that the interaction of several federal statutes upon which the parties rely can better be understood by commencing our discussion with the alleged violations of the Atomic Energy Act.
 
 
 5
 II. The Atomic Energy Act, 42 U.S.C. §§ 2011-2296 (1976 & Supp. I)
 
 
 6
 The Energy Reorganization Act of 1974, Pub.L.No.93-438, 88 Stat. 1233, codified in relevant part at 42 U.S.C. § 5841, reprinted in (1974) U.S.Code Cong. & Admin.News, p. 1401, established the Nuclear Regulatory Commission (NRC) and transferred to it the licensing jurisdiction over private nuclear power plants originally created in the Atomic Energy Act of 1954, Pub.L.No.83-703, §§ 1, 101-110, 68 Stat. 919, 921, 936-39, codified at 42 U.S.C. §§ 2011, 2131-2140, and which were formerly exercised by the Atomic Energy Commission. The Act as amended authorizes the NRC to prescribe regulations "to govern any activity authorized pursuant to this chapter, including standards and restrictions governing the design, location, and operation of facilities used in the conduct of such activity, in order to protect health and to minimize danger to life and property." 42 U.S.C. § 2201(i)(3) (1976 & Supp. I). The NRC has adopted regulations setting forth procedures for imposing requirements by order, or for modification, suspension, or revocation of licenses. 10 C.F.R. §§ 2.200-.206 (1978). As currently codified, the Act provides for hearings in any proceedings "for the granting, suspending, revoking, or amending of any license or construction permit." 42 U.S.C. § 2239(a). Finally, the Act provides that
 
 
 7
 (a)ny final order entered in any proceeding of the kind specified in subsection (a) of this section shall be subject to judicial review in the manner prescribed in the Act of December 29, 1950, as amended, and to the provisions of section 10 of the Administrative Procedure Act, as amended.
 
 
 8
 Id. § 2239(b). The Act of December 29, 1950, referred to in the quoted provision, is the Administrative Orders Review Act, which provides in relevant part that
 
 
 9
 (t)he Court of Appeals has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of
 
 
 10
 (4) All final orders of the Atomic Energy Commission[6] made reviewable by section 2239 of title 42 . . .
 
 
 11
 28 U.S.C. § 2342 (footnote added). NRC contends that its consideration of the problem of disposing of contaminated water at Unit 2 is a license proceeding falling within section 2239(a). It urges that the judicial review provision in section 2239(b) is an exclusive remedy, that no final order has yet been entered in that proceeding, and that in the absence of a final order no court can review its action or inaction. The allegations of the complaint, however, are to the effect that the Operators threaten construction and operation of the Epicor II system without the required license or construction permit and therefore in violation of the Atomic Energy Act. Thus, fairly read, the complaint seeks more than judicial review of incomplete agency action; it seeks to enjoin activity of the licensee said to violate the Act and to endanger the health of the community. Recognizing this, NRC contends that it is the sole tribunal authorized to entertain a charge of such a violation. It points to its regulation, 10 C.F.R. § 2.206, which authorizes any person to file a request with the Director of Nuclear Material Safety and Safeguards, or the Director, Office of Inspection and Enforcement, to institute a proceeding to modify, suspend or revoke a license or take such other action as may be proper. NRC thus argues that the Alliance must first seek administrative relief under section 2.206 and that once NRC's final order in that proceeding is issued, the exclusive review provision of section 2342, 28 U.S.C. § 2342, will govern. Moreover, NRC suggests, this exclusive review mechanism is adequate to protect the public even from pendente lite harm, since a reviewing court also has the power to issue interlocutory injunctions. 28 U.S.C. § 2349(b).
 
 
 12
 It is true that section 2349(b) permits the court of appeals to grant pendente lite relief, but that power exists only in cases over which the court has jurisdiction. It has jurisdiction only over final orders of the agency, however, and thus section 2349(b) affords no authority for the court of appeals to grant relief in order to prevent irreparable injury before the agency gets around to taking action. The Alliance charges that the Operators are in violation of the Act and about to cause irreparable injury, and that NRC has done nothing to prevent that injury. If NRC is correct in arguing that only it can consider the charge of a violation of the Act in the first instance, and that review under the Administrative Orders Review Act is exclusive, then the unavailability of pendente lite relief during the time when the agency has the case under consideration would seem, superficially, to leave a large gap in the protection available to the public. However, that gap appears to be filled by the All Writs Act,[7] for in FTC v. Dean Foods Co., 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966), the Supreme Court held that section 1651(a) authorized courts of appeals to issue preliminary injunctions preserving the status quo, pending final agency action, of matters over which, by virtue of section 11(c) of the Clayton Act, 15 U.S.C. § 21(c) (1976), they had exclusive review jurisdiction. 384 U.S. at 604-05, 86 S.Ct. at 1742-43. The Dean Foods analysis appears to be equally applicable to cases before the NRC. Thus the Alliance could have asked NRC to act, see 10 C.F.R. § 2.206(a), and could have asked the appropriate court of appeals to grant pendente lite relief while NRC considered the case.
 
 
 13
 The pendente lite relief available under 28 U.S.C. §§ 2349(b) and 1651(a), while it makes the NRC argument for absence of district court jurisdiction more palatable, does not decide the question. In other instances in which there was exclusive jurisdiction in the court of appeals under the Administrative Orders Review Act this court has reserved decision on the question whether a district court may entertain cases challenging the timeliness of agency action. City of Trenton v. FCC, 441 F.2d 1329, 1333 & n.8 (3d Cir. 1971); Bucks County Cable TV, Inc. v. United States, 427 F.2d 438, 442 (3d Cir.), cert. denied, 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 61 (1970); see Citizens for a Safe Environment v. Atomic Energy Comm'n, 489 F.2d 1018, 1022-23 (3d Cir. 1974) (expressing no view as to whether Commission's order could be reviewed in district court proceeding for injunctive, declaratory or mandamus relief). Tacitly, at least, we have assumed that despite the exclusive jurisdiction language in 28 U.S.C. § 2342 there may be room for district court relief which did not amount to judicial review of a final agency order. We have not heretofore considered whether, since relief against the Agency is available in the court of appeals under the All Writs Act, we should countenance any erosion of the exclusivity provision. Nor have we considered whether, when an agency has jurisdiction to consider a claim that the Act it is charged with enforcing has been violated, there may still be judicial enforcement against the alleged violator, rather than against the agency. Certainly, however, the answer to the latter question is not to be found in the exclusivity provision. 28 U.S.C. § 2342. For if there is a substantive cause of action available against violators in a non-agency forum, the exclusive review provision of that statute would not apply to the actions of that forum. Rather, the inquiry must be whether the statutory scheme has expressly or impliedly confined enforcement to a single agency, precluding relief in a non-agency forum.
 
 
 14
 The statutory scheme in issue authorizes no person or agency other than the NRC to grant, suspend, revoke or amend a license to operate a nuclear power reactor. 42 U.S.C. § 2239(a). But that section does not in so many words say that a license suspension proceeding is the only method of enforcing the prohibitions of the Act. Peculiarly, however, there are found in the subchapter of the Atomic Energy Act dealing with enforcement, 42 U.S.C. §§ 2271-2282, provisions not called to our attention by any of the parties, which appear to preclude private enforcement. The enforcement subchapter provides for three types of enforcement: criminal prosecutions, id. §§ 2272-2278b; injunction actions, id. § 2280; and civil penalties, id. § 2282. Obviously criminal enforcement is entirely in the hands of the government. Id. §§ 2271(b), 2271(c). The civil penalty provision, which was added by the Atomic Energy Act Amendments of 1969, Pub.L.No.91-161, § 4, 83 Stat. 444, authorizes the Commission to impose such penalties in the first instance, 42 U.S.C. § 2282(a), while their collection is by a civil action instituted by the Attorney General at the Commissioner's request. Id. § 2282(c). As to the injunctive remedy, the Act, as currently codified, provides:
 
 
 15
 Whenever in the judgment of the Commission any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of this chapter, or any regulation or order issued thereunder, the Attorney General on behalf of the United States may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Commission that such person has engaged or is about to engage in any such acts or practices, a permanent or temporary injunction, restraining order, or other order may be granted.
 
 
 16
 Id. § 2280. The statutory setting for the Commission's authority to request injunctive relief must, however, be read in conjunction with section 221(c), the general enforcement provision of the Act, id. § 2271(c), which provides:
 
 
 17
 No action shall be brought against any individual or person for any violation under this chapter unless and until the Attorney General of the United States has advised the Commission with respect to such action and no such action shall be commenced except by the Attorney General of the United States . . . And provided further, That nothing in this subsection shall be construed as applying to administrative action taken by the Commission.
 
 
 18
 Id. The injunctive relief provision first appeared in section 16(c) of the Atomic Energy Act of 1946, Pub.L.No.585, § 16(c), 60 Stat. 755. It authorized the Atomic Energy Commission to commence suits for injunctive relief. In the Atomic Energy Act of 1954, the injunctive remedy was carried forward in section 232, but the authority to sue was given to the Attorney General. Atomic Energy Act of 1954, Pub.L.No.83-703, § 232, 68 Stat. 959. The general prohibition against suits by anyone other than the Attorney General first appeared in section 221(c) of the 1954 Act. Id. § 221(c), 68 Stat. 958. The final proviso, excepting administrative action by the Commission from that prohibition, was added when the Act was amended in 1969. Atomic Energy Act Amendments of 1969, Pub.L.No.91-161, § 5, 83 Stat. 444.
 
 
 19
 We have not found very much by way of legislative history illuminating the reasons for the adoption of section 221(c).[8] But the meaning of that section's language prohibiting judicial enforcement by anyone other than the Attorney General or administrative enforcement by the Commission (now the NRC with respect to private nuclear power reactors) seems plain. "No action shall be brought against any individual or person for any violation . . . except by the Attorney General of the United States." 42 U.S.C. § 2271(c). The only exception for private enforcement appears to be the opportunity to participate in the NRC's administrative proceeding as provided in the Commission's regulations and seek judicial review under section 2239(a). See 10 C.F.R. § 2.206 (1978) (permitting any person to request initiation of commission proceedings to revoke, suspend, modify or take other action with respect to an operator's license). It is true that the "no action" language in section 221(c) is not couched in jurisdictional terms. Compare 42 U.S.C. § 2271(c) with the Norris-LaGuardia Act, § 1, 29 U.S.C. § 101 (1976). But it is also true that Count II seeks relief which under the enforcement scheme of the Atomic Energy Act a district court may not afford to a private litigant. Returning that Count to the district court for the entry of a dismissal under Fed.R.Civ.P. 12(b)(6), rather than under Fed.R.Civ.P. 12(b)(1), would be a futile exercise. The dismissal of Count II must be affirmed because it fails to state a claim upon which relief may be granted.
 
 
 20
 III. National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4361 (1976)
 
 
 21
 Turning to Count I, which charges defendants with violations of section 102 of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4361, 4332 (1976), we note at the outset that the statute is directed toward the activities not of private parties but of the federal government. Thus although Count I alleges that the Operators have violated the provisions of their Operating License for Unit 2 by failing to provide a written evaluation of the environmental impact of their actions, Complaint P 80, that allegation adds nothing of substance to the charge that the National Environmental Policy Act has been violated.[9] Indeed the analysis we have made in Part II, supra, compels the conclusion that the district court may not consider the alleged violation of the Operating License. The sufficiency of Count I must be determined by the allegations that are directed against NRC.
 
 
 22
 The NRC has recognized its obligation to comply with the National Environmental Policy Act by promulgating regulations governing licensing and regulatory policy and procedures with respect to environmental protection. See 10 C.F.R. §§ 51.1 to .56 (1978). The NRC requires applicants for construction or operation permits to file an environmental report. Id. § 51.20. A draft environmental impact statement is then prepared by the NRC staff and is distributed to appropriate federal agencies and published in the Federal Register. Id. §§ 51.22 to .25. After comments have been received, the Director of Nuclear Reactor Regulation or the Director of Nuclear Material Safety and Safeguards or their designee prepares a final environmental impact statement. Both the draft statement and the final statement accompany the application through the NRC review process. Id. § 51.26. The regulations recognize that the Director of Nuclear Reactor Regulation or the Director of Nuclear Material Safety and Safeguards may determine that no environmental impact statement need be prepared for a particular action, but provide that any party to an NRC proceeding may take a position and offer evidence on the aspects of the proposed action claimed to fall within the Act. Id. §§ 51.5(c), 51.50(d), 51.51(b)(1). The adequacy of NRC compliance with the National Environmental Policy Act in any license proceeding is reviewable in the court of appeals pursuant to 42 U.S.C. § 2239(b) and 28 U.S.C. § 2342. See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 526-27, 98 S.Ct. 1197, 1203-04, 55 L.Ed.2d 460 (1978) (final decision of AEC with respect to licensing and compliance with National Environmental Policy Act requirements is reviewable in court of appeals under 28 U.S.C. § 2342 and 42 U.S.C. § 2239); New England Coalition on Nuclear Pollution v. NRC, 582 F.2d 87, 93 (1st Cir. 1978) (final environmental impact statement of NRC is reviewable).
 
 
 23
 What the Alliance charges in this suit is that NRC, by fragmenting its consideration of the problem of disposing of the contaminated water in Unit 2, and authorizing the erection and operation of Epicor II to dispose of the intermediate level contaminated water, without preparation or consideration of either a draft or a final environmental impact statement, has frustrated the Act and violated NRC's plain statutory duty.[10] Segmentation of a large or cumulative project into smaller components in order to avoid designating the project a major federal action has been held to be unlawful.[11] Thus the legal issue presented by Count I is whether, despite the availability of review in the court of appeals when the NRC issues a final order, the district court has jurisdiction to compel compliance with the National Environmental Policy Act by prohibiting such segmentation.
 
 
 24
 Enforcement of the environmental impact statement requirement generally has been assumed to be within the subject matter jurisdiction of the district courts. E.g., Flint Ridge Dev. Co. v. Scenic Rivers Ass'n., 426 U.S. 776, 782-83, 96 S.Ct. 2430, 2435, 49 L.Ed.2d 205 (1976); Environmental Defense Fund v. Tennessee Valley Auth., 468 F.2d 1164 (6th Cir. 1972). Moreover, the analysis of the enforcement subchapter of the Atomic Energy Act in Part II, supra, is inapplicable. Count I is not directed to a violation of that Act, but to a violation of the National Environmental Policy Act of 1969, and private enforcement of that statute has been the rule. Whatever were the policy reasons for concentrating enforcement of the Atomic Energy Act in the hands of the Attorney General, they do not apply to Count I.
 
 
 25
 Where, however, an agency provides an opportunity for private parties to intervene and raise the issue of the necessity for preparation of an environmental impact statement, and where both review and pendente lite relief can be obtained in the court of appeals, it would not be an unreasonable construction of the Administrative Orders Review Act, 28 U.S.C. § 2342, that enforcement of the National Environmental Policy Act against that agency is available only in the court of appeals. That is the construction which is sought by NRC. In Scientists' Institute for Public Information, Inc. v. AEC (SIPI), 481 F.2d 1079 (D.C.Cir. 1973), the Court of Appeals for the District of Columbia Circuit held that the district court could, and should, entertain an action to enforce the environmental impact statement requirement against the Atomic Energy Commission, to which the same review scheme applies. In that case Judge Wright gave considerable attention to the significance of timing of the impact statement. Id. at 1093-98. The Alliance makes the valid point that when by fragmentating its consideration the NRC postpones preparation of an impact statement until after private parties have been permitted to expend large sums on construction, the resulting change in the status quo has the almost inevitable effect of distorting the later view of both the agency and the reviewing court as to the desirability of the action in question. See Calvert Cliffs' Coord. Comm. v. AEC, 449 F.2d 1109, 1127 (D.C.Cir. 1971) (AEC should not be permitted to foreclose alternative solutions by delaying environmental impact statements). Although the Supreme Court has repudiated the list of factors relevant to timing that was enumerated by Judge Wright in SIPI, see Kleppe v. Sierra Club, 427 U.S. 390, 403-06, 96 S.Ct. 2718, 2727-28, 49 L.Ed.2d 516 (1976), and has described NEPA's requirement that an environmental impact statement be prepared as "precise," id. at 406, 96 S.Ct. at 2728, the significance of the timing decision cannot be ignored. Like other agencies, NRC must be afforded some flexibility with respect to timing of the preparation of impact statements. See Aberdeen & Rockfish R. R. Co. v. SCRAP, 422 U.S. 289, 320, 95 S.Ct. 2336, 2355, 45 L.Ed.2d 191 (1975) (preparation of statement required by statute once proposal submitted); Westinghouse Elec. Corp. v. NRC, 598 F.2d 759, 776-78 (3d Cir. 1979) (National Environmental Policy Act permits NRC to defer statement preparation pending policy decision); New England Coalition on Nuclear Pollution v. NRC, 582 F.2d 87, 93-94 (1st Cir. 1978) (agency not required to revise statement when proposal revised). But the timing problem is a real one especially when private parties are permitted by a federal agency to make major construction expenditures in advance of consideration of environmental issues. The Supreme Court in Kleppe held that once the agency, here the NRC, is presented with a proposal, as in the instant case, then the impact statement must be prepared. 427 U.S. at 405-06, 96 S.Ct. at 2728, quoting Aberdeen & Rockfish R. R. Co. v. SCRAP, 422 U.S. at 320, 95 S.Ct. 2336; see Kleppe v. Sierra Club, 427 U.S. at 419 n.1, 96 S.Ct. at 2734 n.1 (Marshall, J., concurring in part and dissenting in part) (majority opinion does not permit agency to delay preparation of statement once proposal submitted). Thus the NRC does not have unfettered discretion, and the real issue before us is whether the court of appeals or the district court can consider the claim that such a course of action should not be permitted.
 
 
 26
 It is conceivable that the All Writs Act, 28 U.S.C. § 1651, as interpreted in FTC v. Dean Foods Co., 384 U.S. 597 (1966), may authorize the court of appeals to enforce timely compliance with the National Environmental Policy Act with respect to agency proceedings that it may ultimately review. Another conceivable approach is to hold that whenever NRC takes any action having the effect of permitting a licensee to commence construction of any facility there is a final order within the meaning of 42 U.S.C. § 2239(b). Neither approach seems desirable. In many instances determination of when an impact statement should be prepared will require a record. While the court of appeals can devise procedures for the preparation of a record in a section 1651 proceeding, the district court has both procedures and facilities at hand for that task. Thus resort to the more ordinary remedy of a suit for declaratory or injunctive relief, or to the mandamus remedy authorized by 28 U.S.C. § 1361 seems preferable to inviting litigation here. The approach of treating any NRC action which permits a licensee to do anything as a final order, aside from the problems arising from the absence of a record, poses the additional problem of proliferation of litigation over what agency action is final for purposes of review. See Westinghouse Elec. Corp. v. NRC, 598 F.2d at 768 n. 35. This is not a case in which the administrative record is complete and a final order has undoubtedly been made. E.g., Natural Resources Defense Council, Inc. v. NRC, 606 F.2d 1261, 1264-66 (D.C.Cir. 1979).
 
 
 27
 We conclude, therefore, that a claim that NRC is not complying with the National Environmental Policy Act states a cause of action over which the district courts have subject matter jurisdiction, and that dismissing Count I for lack of subject matter jurisdiction was error. Our holding that there is subject matter jurisdiction over Count I should not be construed as an indication that the requested relief, injunctive or declaratory, should be granted. It may be that NRC will convince the court that its fragmentation of the contaminated water problem was entirely proper, or at least within the range of permissible agency discretion on the timing of environmental impact statements. It may be appropriate, moreover, for the district court to stay its hand pending further agency proceedings, while retaining jurisdiction. These are issues which on the present record are not before us. Nor on this record do we have any occasion to determine what effect the NRC's November 21, 1979 Statement of Policy and Notice of Intent to Prepare a Programmatic Environmental Impact Statement may have on the proper disposition of Count I.
 
 
 28
 IV. Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1376 (1976 & Supp. I)
 
 
 29
 In Count III the Alliance charges that the Operators are threatening to violate section 301(f) of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1376, 1311(f) (1976 & Supp. I), which provides:
 
 
 30
 Notwithstanding any other provisions of this chapter it shall be unlawful to discharge any radiological, chemical, or biological warfare agent or high-level radioactive waste into the navigable waters.
 
 
 31
 Id. § 1311(f).
 
 
 32
 In dealing with Count III the district court ruled:
 
 
 33
 Count III, which is tenuous at best because it is based on a possible future action, is also subject to the exhaustion principle.
 
 
 34
 With no further analysis, the court concluded that it lacked subject matter jurisdiction over Count III. But the prohibition in section 301(f) is absolute; NRC has no discretion to consider whether or not to permit a prohibited discharge. Moreover the Federal Water Pollution Control Act, in sharp contrast with the Atomic Energy Act, provides expressly for private enforcement. See 33 U.S.C. § 1365 (citizens' suit provision). Section 505(a) of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(a) provides:
 
 
 35
 Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf
 
 
 36
 (1) against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter . . . or
 
 
 37
 (2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.
 
 
 38
 The district courts shall have jurisdiction without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard . . . or to order the Administrator to perform such act or duty, as the case may be. . . .
 
 
 39
 This type of citizens' suit provision is similar to those included in a number of federal environmental statutes.[12] Like each of those statutes, the citizens' suit provision in the Federal Water Pollution Control Act states that no such action may be brought prior to sixty days after the plaintiff has given notice of the alleged violation to the Administrator of the agency responsible for the enforcement of the standard allegedly violated, in this case the Administrator of the Environmental Protection Agency (EPA). Federal Water Pollution Control Act Amendments § 505(b), 33 U.S.C. § 1365(b). In Train v. Colorado Public Interest Research Group, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976), the Supreme Court addressed the issue whether the Administrator of the EPA could, under the Federal Water Pollution Control Act, regulate discharges into navigable waters of nuclear waste materials which were subject to regulation under the Atomic Energy Act. There the Court held that the three types of radioactive material defined in the Atomic Energy Act[13] were subject to regulation by the NRC rather than by the EPA. Id. at 25. We do not decide today whether, on the merits, plaintiffs can prove that the threatened discharges from Three Mile Island are radioactive wastes within the scope of the Federal Water Pollution Control Act. We hold only that plaintiffs' allegations under that Act were sufficient for the purpose of subject matter jurisdiction.
 
 
 40
 The complaint alleges that two days prior to the filing of the complaint the Alliance gave the required notice both to the Administrator of EPA and to the NRC. There are exceptions in section 505(b) to the 60-day notice requirement with respect to violations of sections 306 and 307(a) of the statute, 33 U.S.C. §§ 1316 and 1317(a). There is no exception, however, to the waiting period for radioactive waste discharged in violation of section 301(f), 33 U.S.C. § 1311(f). We have been referred to no legislative history revealing why high-level radioactive waste, which many people would consider ultrahazardous, was not included among the exceptions to the waiting period. Appellants have urged that the omission was somehow inadvertent, and that we should read the exceptions as applicable. We decline to do so. While we are puzzled by the omission we are not free to rewrite the statute.
 
 
 41
 NRC has taken before this court a rather pragmatic approach to the 60-day notice provision. It observes:
 
 
 42
 The 60-day notice provision in Section 505(b) of the Clean Water Act, 33 U.S.C. (s) 1365(b) is in the nature of a statutorily mandated jurisdictional exhaustion requirement designed to afford an agency an opportunity to pass upon claims of alleged violations of the Clean Water Act prior to a citizen's suit to enforce the Act's effluent limitations. While plaintiffs' suit, filed 2 days after mailing notice, was therefore premature, dismissal for failure to observe the 60-day condition of 33 U.S.C. (s) 1365(b) would serve no purpose. The Agencies, EPA and (NRC), were in fact given an opportunity to respond to plaintiff's Clean Water Act claim and did so prior to judicial disposition of the complaint. Both found the Clean Water Act claim to be without merit. . . . It would have been excessive formalism for the district court to have required Count III of the complaint to have been re-filed on July 23 in order to accommodate the 60-day notice provision.
 
 
 43
 Supplemental Brief for Appellee Nuclear Regulatory Commission at 4. The Operators make no such concession. They contend that premature suits should be dismissed for lack of jurisdiction even if at the time when the district court acts upon the motion to dismiss the responsible agency has had notice for sixty days.
 
 
 44
 We agree with NRC that reading section 505(b) to require dismissal and refiling of premature suits would be excessively formalistic. At the time the district court acted, on the face of the complaint it appeared that NRC had had notice of the alleged violation under consideration for more than sixty days. Certainly, then, the complaint alleged a claim over which the district court had subject matter jurisdiction under section 505(a), 33 U.S.C. § 1365(a).
 
 
 45
 Moreover, as we recently held in National Sea Clammers Association v. City of New York, 616 F.2d 1222 (3d Cir. 1980), the savings clause in the citizens' suit provision, 33 U.S.C. § 1365(e), has independent significance preserving private causes of action for persons who can allege the requisite jurisdictional amount for jurisdiction under 28 U.S.C. § 1331. The complaint pleads the jurisdictional amount and general federal question jurisdiction under section 1331. It charges that the plaintiffs will be injured in fact by the discharge of radioactive waste into the Susquehanna River. Reading the complaint as a whole, it is clear that Count III states a claim within the subject matter of the district court entirely apart from the Federal Water Pollution Control Act's citizens' suit provision. 33 U.S.C. § 1365(a). See National Sea Clammers Ass'n v. City of New York, 616 F.2d at 1227-1228.
 
 
 46
 Thus we hold that the district court erred in dismissing Count III for lack of subject matter jurisdiction. The NRC and the Operators, perhaps anticipating that result, urge that the dismissal should nevertheless be affirmed for failure to state a claim upon which relief may be granted. Their theory is that NRC has authority to enforce the Federal Water Pollution Control Act with respect to radioactive discharges from nuclear power reactors, and that the doctrine of exhaustion of administrative remedies prevents a district court from considering this complaint. This argument is a variant of that which we discussed in Part II, supra, that the alleged violation of section 301(f), 33 U.S.C. § 1311(f), can be considered by the court of appeals when it reviews a final order of the NRC.
 
 
 47
 There is no room for that argument in the enforcement scheme of the Federal Water Pollution Control Act. The citizens' suit provision in section 505, 33 U.S.C. § 1365, contains its own specification of the degree to which district courts must defer to administrative agencies. Under the plain language of that section, the district courts should defer for sixty days, and at that point determine whether or not the violation has been halted by administrative action or otherwise. If is it has not been so halted, the citizen's suit goes forward. It does not wait in what may be a perpetual limbo while the agency decides whether or not to take action. A similar analysis applies to the private causes of action preserved by section 505(e), 33 U.S.C. § 1365(e). The very fact that the savings clause was inserted suggests that there was no intention on the part of Congress to deprive parties actually injured by conduct violating the Act of access to conventional legal remedies such as damages or injunctive relief. NRC has no authority to grant relief which would make such parties whole, and we would have to find rather compelling evidence of congressional intent before we would hold that there was no opportunity to resort to either preventative or make-whole judicial remedies while that agency considered the underlying problem. That is not to suggest that when the district court considers this case for injunctive and declaratory relief on the merits a great deal of deference to NRC's expertise may be inappropriate. But we can approve dismissal of Count III on the theory that it fails to state a claim upon which relief may be granted only if we can fairly conclude that at final hearing the Alliance could prove no set of facts upon which either form of relief would be warranted. We cannot do so. Since Count III states a claim within the subject matter jurisdiction of the district court upon which at final hearing some relief might be given the order dismissing that Count was error.
 
 V. Constitutional Claims
 
 48
 In Count IV the Alliance charges that NRC, by allowing effluents from Unit 2 in excess of those permitted by the operating license, violated various provisions of the Constitution, to plaintiffs' injury in that they have been exposed to the risk of cancer and genetic damage. The district court dismissed this claim for lack of subject matter jurisdiction on the theory that since NRC could consider the same claim, exhaustion of administrative remedies and resort to court of appeals review under section 2239(b), 42 U.S.C. § 2239(b), was required.
 
 
 49
 Certainly a complaint alleging a cause of action for private relief implied from provisions of the United States Constitution states a claim within the subject matter of the district court. Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed.2d 939 (1946). The legal sufficiency of that claim is a separate matter, which the district court did not reach. Whether or not a cause of action in favor of the plaintiffs against the NRC, implied from the Constitution, and seeking protection from irreparable harm pendente lite, could be adjudicated by the NRC is at least doubtful, if for no other reason than that its arsenal of remedies includes only those specified in the Atomic Energy Act. Preliminary injunctive relief to prevent irreparable unconstitutional injury is not among those remedies. Whether NRC has adjudicatory competence to consider constitutional claims at all is a matter we need not reach.[14] As a judicially created doctrine, the requirement of exhaustion has traditionally been waived in three circumstances under the case law of this circuit. We have declined to require exhaustion when the challenged agency action presents a clear and unambiguous violation of statutory or constitutional rights, First Jersey Securities, Inc. v. Bergen, 605 F.2d 690, 697 (3d Cir. 1979); Barnes v. Chatterton, 515 F.2d 916, 920 (3d Cir. 1975), when resort to administrative procedures is "clearly shown to be inadequate to prevent irreparable injury," Babcock and Wilcox Co. v. Marshall, 610 F.2d 1128, 1138 (3d Cir. 1979), quoting American Fed'n of Gov't Employees, Local 1004 v. Resor, 442 F.2d 993, 994-95 (3d Cir. 1971), or when exhaustion is "futile," United States ex rel. Marrero v. Warden, Lewisburg Penitentiary, 483 F.2d 656, 659 (3d Cir. 1973), rev'd on other grounds, 417 U.S. 653, 94 S.Ct. 2532, 41 L.Ed.2d 383 (1974). The plaintiffs' present allegation of irreparable harm to their constitutional right to "life and liberty" meets the irreparable harm standard. Cf. Honicker v. Hendrie, 465 F.Supp. 414, 419-20 (M.D.Tenn.1979), aff'd and opinion of district court adopted, 605 F.2d 556 (6th Cir. 1979) (noting that if plaintiff had shown irreparable harm under Atomic Energy Act before available agency action "the court would not feel constrained by the doctrine of primary jurisdiction and would not hesitate to act to protect plaintiff's rights"). Although we have held that, under the Occupational Safety and Health Act, 29 U.S.C. §§ 651-678 (1976), fourth amendment claims are subject to the exhaustion requirement, those holdings do not suggest the same conclusion here. In those cases exhaustion is required because the Occupational Safety and Health Review Commission "is the only tribunal available for the development of a factual record." Bethlehem Steel Corp. v. OSHRC, 607 F.2d 1069, 1074 (3d Cir. 1979) (emphasis added); Babcock & Wilcox Co. v. Marshall, 610 F.2d 1128, 1137, 1140 (3d Cir. 1979); Marshall v. Whittaker Corp., 610 F.2d 1141, 1148 (3d Cir. 1979). Because the district court is an available forum for creation of a factual record in the instant case, and is the only forum in which the claim of irreparable harm can be addressed, we hold that it is the appropriate forum for the presentation of these constitutional claims. Thus we conclude that the district court erred in assuming that Count IV states a claim within the exclusive jurisdiction of the NRC.
 
 
 50
 Since it is entirely possible that any relief to which the defendants may be entitled can be awarded on statutory grounds under Count I or Count III, it may be unnecessary for the district court, and thus for this court, to determine whether Count IV states a claim upon which relief, implied directly from one or more of the several constitutional provisions relied upon, may be granted. Consistent with the policy against premature adjudication of constitutional law questions, we hold no more than that the district court has subject matter jurisdiction over Count IV.
 
 VI. Conclusion
 
 51
 Pervading the treatment of the case by the district court, as well as the briefs of appellees, is the notion that the judge-made rule of exhaustion of administrative remedies bears upon the subject matter jurisdiction of the district court. That error is fundamental. Congress can, of course, limit the subject matter jurisdiction of the district courts, and can relegate some matters to the exclusive jurisdiction of an administrative agency. It can also prohibit private enforcement of federal statutes. In Part II, supra, we hold that in the Atomic Energy Act it did both. Where, however, Congress has not given any such clear indication, judge-made rules, such as the requirement of exhaustion of administrative remedies, cannot affect the subject matter jurisdiction of the district courts, but affect only the timing, and in some cases the merits, of the claim for relief. See generally K. Davis, Administrative Law of the Seventies § 20.01 (1976). Determining whether the judge-made rule requiring exhaustion of administrative remedies should be relied upon in a given instance to delay or deny a remedy otherwise available from a court requires a careful analysis of the statutory scheme relied on by the plaintiff, of the completeness or incompleteness of remedies available from the agency, of the presence or absence of harm pendente lite, and of the likely intention of Congress with respect to private enforcement. Such analysis is not likely to be thorough if it is attempted at the outset on a motion to dismiss under Rule 12, Fed.R.Civ.P. 12.
 
 
 52
 The judgment appealed from will be affirmed insofar as it dismissed Count II of the complaint. In all other respects, it will be reversed.
 
 
 
 [1]
 It is further conceded that approximately 100,000 gallons of high level radioactive waste water have accumulated in the reactor's primary cooling system, from which approximately 1,000 to 1,500 gallons per day is leaking into the containment building
 
 
 [2]
 See Office of Nuclear Reactor Regulation, Nuclear Regulatory Comm'n, Use of EPICOR-II at Three Mile Island, Unit 2 §§ 3.3, 5.1-5.2 (Aug. 14, 1979)
 
 
 [3]
 33 U.S.C. § 1311(f) (1976 & Supp. I) (also referred to by the short title of Clean Water Act of 1977)
 
 
 [4]
 See Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor, 485 F.Supp. 81, 88 (W.D.Pa.1979)
 
 
 [5]
 A panel of this court on October 17, 1979, denied a motion by appellants for injunctive relief pending appeal. In view of our disposition on the merits of the district court's jurisdictional ruling, that court is free to consider any application for preliminary injunctive relief which may be brought before it
 
 
 [6]
 Since the NRC is now exercising certain of the powers formerly exercised by the Atomic Energy Commission, 42 U.S.C. § 5841 (1976), this provision gives the court of appeals jurisdiction over the NRC's orders that are reviewable under 42 U.S.C. § 2239
 
 
 [7]
 28 U.S.C. § 1651 (1976). That Act provides in relevant part that the courts of appeals "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." Id. § 1651(a)
 
 
 [8]
 The Senate Report which accompanied the Senate version of the bill states, with respect to section 221(c):
 No action may be brought for any violation of the act until the Attorney General has advised the Commission with respect to such action. All actions are required to be brought by the Attorney General as the legal representative of the Commission before the courts. In those cases involving the death penalty, action may be brought on the express direction of the Attorney General himself.
 S.Rep.No.1699, 83d Cong., 2d Sess. reprinted in (1954) U.S.Code Cong. & Admin.News 3456, 3485-86. The two Conference Committee reports make no reference to section 221. See H.R.Conf.Rep.No.2639, 83d Cong., 2d Sess. reprinted in (1954) U.S.Code Cong. & Admin.News, p. 3529; H.R.Conf.Rep. No.2666, 83d Cong., 2d Sess. reprinted in (1954) U.S.Code Cong. & Admin.News, p. 3534.
 
 
 [9]
 The National Environmental Policy Act's requirement that an environmental impact statement be prepared is directed at the agencies of the federal government, not at private parties. See National Environmental Policy Act of 1969, § 102(2)(C), 42 U.S.C. § 4332(2)(C) (1976)
 
 
 [10]
 The NRC, in resisting the grant of an injunction pending appeal disputed that charge, contending that it had directed its staff to prepare a draft environmental impact statement. It is not disputed, however, that NRC gave the Operators oral approval to begin the installation of Epicor II, without awaiting the preparation of that draft statement
 
 
 [11]
 E.g., City of Rochester v. United States Postal Serv., 541 F.2d 967, 972 (2d Cir. 1976) ("To permit noncomprehensive consideration of a project divisible into smaller parts, each of which taken alone does not have a significant impact but which taken as a whole has cumulative significant impact, would provide a clear loophole to NEPA."); Scientists' Inst. for Pub. Information, Inc. v. AEC, 481 F.2d 1079, 1086 n.29, 1086-89 (D.C.Cir. 1973) (statement required for overall project where individual actions are related logically or geographically). See generally W. Rodgers, Environmental Law §§ 7.7, 7.9 (1977) (discussing problems arising from scope and timing of environmental impact statements). The Supreme Court, however, has made clear that there is no affirmative obligation to regionalize a proposal under NEPA; a project of genuinely small scope of course would not be an impermissible segmentation. See Kleppe v. Sierra Club, 427 U.S. 390, 399-402, 96 S.Ct. 2718, 2725-2726, 49 L.Ed.2d 516 (1976) (no obligation to prepare impact statement as to regional effects where no regional action proposed)
 
 
 [12]
 Toxic Substances Control Act, §§ 20, 21, 15 U.S.C. §§ 2619, 2620 (1976); Surface Mining Control and Reclamation Act of 1977, § 520, 30 U.S.C. § 1270 (1976 & Supp. I); Marine Protection, Research, and Sanctuaries Act of 1972, § 105, 33 U.S.C. § 1415 (1976); Deepwater Port Act of 1974, § 16, 33 U.S.C. § 1515 (1976); Safe Drinking Water Act, § 2(a), 42 U.S.C. § 300j-8 (1976 & Supp. I); Noise Control Act of 1972, § 12, 42 U.S.C. § 4911 (1976); Resource Conservation and Recovery Act of 1976, § 2, 42 U.S.C. § 6972 (1976 & Supp. I); Clean Air Amendments of 1970, § 12(a), 42 U.S.C. § 7604 (1976 & Supp. I)
 
 
 [13]
 The Atomic Energy Act regulates three types of radioactive materials: special nuclear material, source materials, and byproduct material. 42 U.S.C. §§ 2014(e), 2014(z), 2014(aa); see 42 U.S.C. §§ 2021a, 2022 (disposal of waste)
 
 
 [14]
 See Weinberger v. Salfi, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975)