**In re Clarence E. WINCHESTER and Juanita C. Winchester, Debtors.**

**Juanita C. WINCHESTER, Individually and as Executrix of the Estate of Clarence E. Winchester, Debtors in Possession, Plaintiff,**

**v.**

**COMMODITY CREDIT CORPORATION and United States of America, Acting By and Through the United States Department of Agriculture, Agricultural Stabilization & Conservation Service, Defendants.**

Bankruptcy No. 89–31324.
Adv. No. 91–3047.

United States Bankruptcy Court,
N.D. Mississippi.

Oct. 4, 1991.

David R. Hunt, Lawrence M. Magdovitz, Clarksdale, Miss., for plaintiff.

Jim M. Greenlee, Asst. U.S. Atty., Oxford, Miss., for defendants.

## OPINION

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is a motion to dismiss filed by the defendants, Commodity Credit Corporation (CCC), a corporation wholly owned by the United States of America, and Agricultural Stabilization & Conservation Service (ASCS), an agency of the United States Department of Agriculture; response to said motion having been filed by the plaintiff, Mrs. Juanita C. Winchester, individually, and as the Executive of the Estate of Clarence E. Winchester, Deceased; and the court having heard and considered same hereby finds as follows, to-wit:

### I.

The court has jurisdiction of the subject matter of and the parties to this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157.

That portion of the plaintiff's complaint seeking redress for the defendants' alleged violation of the automatic stay is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), and (O).

The balance of the plaintiff's complaint, dealing with the defendants' decision to disallow the 1988 rice disaster payment allegedly owed to Clarence E. Winchester, is also a core proceeding as defined in 28 U.S.C. § 157(b)(2)(A), (E), and (O). This portion of the complaint asserts a cause of action against two federal agencies which is not based on state law, but rather on federal statutes and regulations that are applicable to said agencies.

### II.

■ The defendants contend through the motion to dismiss that the plaintiff has not exhausted her administrative remedies as required by law. The plaintiff takes the position that administrative remedies are not applicable to this proceeding, or, alternatively, that she falls within one of the exceptions to the theory that administrative remedies must be exhausted before proceeding in a judicial forum. These exceptions are set forth as follows:

1. The futility of the administrative processes.

2. The irreparable harm caused to the plaintiff, a Chapter 12 debtor in bankruptcy, as a result of being required to exhaust her available administrative remedies.

3. The unreasonable delay in the administration of the bankruptcy case caused by the debtor having to exhaust administrative remedies.

4. The agency's callous disregard of the debtor's Constitutional rights.

5. The inadequacy of the debtor's remedies at law.

(See, Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor, 619 F.2d 231 (3rd Cir.1980) and Baldwin Metals Co., Inc. v. Donovan, 642 F.2d 768 (5th Cir.1981)).

### III.

### FACTUAL BACKGROUND

The factual scenario related to this proceeding essentially involves two farms which are located adjacent to each other in Quitman County, Mississippi:

Farm No. 738—Operated by C & B Farms, Inc., a corporation owned by Clarence E. Winchester and his son, Bradley Winchester.

Farm No. 425—Operated exclusively by Clarence E. Winchester, individually.

Both farms were leased during calendar year 1988, either directly or indirectly, from the Mississippi Department of Corrections.

On May 16, 1988, pursuant to an application filed by Clarence E. Winchester (Mr. Winchester), the defendants made an advance payment under the 1988 Rice Disaster Program to Mr. Winchester in the sum of $6,449.00.

On August 17, 1988, the Quitman County ASCS Committee (County Committee) met and rendered a decision reducing the yields on both farms, for purposes of calculating the rice disaster payments, to the actual production realized during 1988, which was zero. This decision effectively meant that neither Mr. Winchester nor C & B Farms, Inc., would receive any funds from the 1988 Rice Disaster Program. Also because of this action, the defendants took the position that the advance payment in the sum of $6,449.00 should be refunded by Mr. Winchester.

On September 15, 1988, J.R. Boyd, Jr., the ASCS County Executive Director for Quitman County, mailed a letter to Mr. Winchester, at an incorrect mailing address, purporting to advise him of the County Committee's decision relative to both his farm and the farm operated by C & B Farms, Inc. Pertinent excerpts from this letter, attached as an exhibit to the defendants' motion to dismiss, are set forth as follows:

> Due to numerous reports from the public, I made a visit to *your farms 425 and 738* on July 18 and inspected your rice crop. (emphasis added)

The following observations were made:

Farm 425

1. Weeds and vegetation were 4 to 5 feet tall and rice could not be identified without getting in the field.
2. All fields were dry. No water was being pumped. Fields on the south end did not appear to have had any water at any time this year.
3. There was no evidence that any herbicides had been applied.

Farm 738

1. Vegetation was not as large on this place but it had not been controlled.
2. There was evidence that some kind of herbicide had been applied on some of the area.
3. I did not see a single levee that had been butted up.
4. There was no evidence of any water having been applied all year to any fields.

This information was presented to the County Committee on August 17, 1988. Donald Respess, Vice Chairman of the committee, stated that he sees some of your rice crop every day. He has also seen the rice on farm 738. He verified the conditions that I reported to the committee.

After reviewing the above information, the committee determined that normal cultural practices for the production of rice has not been carried out on *your farms.* ASCS procedure requires that when normal cultural practices have not been performed, the farm payment yield must be reduced to the yield that could be expected from practices actually performed. Therefore, this is to inform you that the committee determined that your 1988 rice payment yield will be reduced to the actual yield that you produce. Please submit your rice production immediately after harvesting. (emphasis added)

After protracted negotiations between the parties concerning a request for reconsideration, the following events occurred, *all subsequent to Mr. and Mrs. Winchester's bankruptcy filing on June 9, 1989:*

A. By a letter dated September 5, 1989, (Plaintiff's Exhibit 4) the County Executive Director advised Mr. Winchester that on August 16, 1989, the County Committee had again conducted a meeting, reviewed his appeal, and denied his request as to *both farms.* The letter further indicated that a hearing would be set to reconsider Mr. Winchester's appeal on September 20, 1989, at 2:00 p.m.

B. On September 19, 1989, one day earlier than set forth in the aforementioned notice, the County Committee conducted another hearing relative to *both farms.* Through a letter dated October 5, 1989, (Plaintiff's Exhibit 6) Mr. Winchester was advised of the results of this hearing. Certain excerpts from this letter are significant, to-wit:

1. There were several reports from the public that the crop on *farms 425 and 738* were not being cared for in a normal manner. (emphasis added)

4. An official farm visit was made by the CED on July 18, 1988, and found that the entire crop on both farms had been abandoned.

5. The only evidence of water being applied was on farm 425, fields 14 and 16. If water had been put on any other fields on either farm, there was no evidence of it on July 18.

6. There was some evidence that a herbicide had been applied to fields 2 and 3 on farm 738 but the vegetation on *both farms* was so bad that rice could not be identified without walking into the field. (emphasis added)

9. There were 107 rice farms in Quitman County in 1988 with 16,400 acres planted and only 237 acres failed on the other 105 farms. Mr. Winchester had the only rice farm that had no harvested production and the failed rice on these farms totals 593.8 acres.

10. 1988 was one of the best rice crops that Quitman County has ever had.

Based on these ten items, the county committee determined that the reason Mr. Winchester did not get a stand of rice was because he did not flush the fields. The failure was due to lack of management. The committee determined that the rice payment yield should remain at the actual yield on *these farms* which was zero. (emphasis added)

If you feel that the committee has not properly considered the facts in the case, you may appeal this decision to the State Committee within 15 days of the date of this letter. The address is Mississippi State ASC Committee, 6310 I–55 North, P O Box 14995, Jackson MS 39236–4995. If you appeal this decision to the State Committee, you should furnish factual information and state why you believe the county committee's determination is wrong.

C. By a letter dated October 18, 1989, (Plaintiff's Exhibit 7) the attorney representing Mr. Winchester submitted an appeal applicable to both farms to the Mississippi ASCS State Committee (State Committee). This letter advised the State Committee that the County Committee decision had possibly occurred in violation of the automatic stay set forth in 11 U.S.C. § 362(a). On October 25, 1989, the ASCS State Executive Director, C.R. Hull, responded to Mr. Winchester's appeal and indicated that the case file would be referred to the Regional Attorney for review. (Plaintiff's Exhibit 8) Apparently because of the bankruptcy filing, the State Committee was unsure as to how to proceed.

D. By letter dated August 17, 1990, (Plaintiff's Exhibit 9) the County Executive Director advised Mr. Winchester's attorney that the request for reconsideration filed by C & B Farms, Inc., would be heard on September 12, 1990, at 2:00 p.m. On that date, a hearing was conducted before the County Committee and a transcript of the proceeding was prepared. (Plaintiff's Exhibit 5) The transcript indicates that the County Committee discussed the farming operation of not only C & B Farms, Inc., but also that of Mr. Winchester. Evidencing that there was little distinction between the two farming operations, the transcript at page 12 reveals the following:

ASCS–JB (Indicating J.R. Boyd, Jr., ASCS County Executive Director) David, you said you hate to be an

adversary. We have to look at the overall county, that if you've got rice adjoining on the east, you've got rice adjoining on the north, you've got rice joining on the west, you've got rice adjoining on the south. All those folks made one of the best rice crops that had ever been made in the county. And we have to try to figure out what happened to Mr. Winchester's rice, why he didn't make any rice. He makes absolutely nothing. On all four joining farms and all four directions— one of them worked by Don—made a good rice crop that year. And this farm didn't make any rice on any field. (See also transcript pages 6, 9, 10, 15, and 16.)

E. By letter dated September 18, 1990, (Plaintiff's Exhibit 10) the County Executive Director informed Mr. Winchester's attorney that the reconsideration request had been denied by the County Committee and, that insofar as C & B Farms, Inc., was concerned, the rice yield on farm 738 would remain at zero.

F. The decision of the County Committee was appealed to the State Committee and a hearing was conducted on December 13, 1990. Evidenced by a letter dated December 18, 1990, (Plaintiff's Exhibit 12) the State Committee affirmed the County Committee's decision. Two paragraphs from this letter, written by the State Executive Director, are set forth as follows:

After hearing the testimony presented by you, the committee understands your position to be that C & B Farms, Inc., had done everything that would normally have been expected to obtain a stand and produce a crop of rice. The committee noted that the rice fields on the farm were not flushed. The committee noted that the flushing of rice was a normal management and cultural practice in rice production and that other farms in the area flushed their rice fields several times in 1988 in order to obtain a stand of rice. The committee further noted that Quitman County farmers produced approximately 16,000 acres of excellent rice in 1988.

After consideration of the information presented by you and a review of the case file, the committee determined to sustain the action of the Quitman County ASC Committee and to deny the appeal. The committee concluded that the failure of the rice crop was not due to weather or disaster-related conditions and in fact was due to the management decisions of the producers.

These are the identical reasons given earlier by the County Committee for the denial of Mr. Winchester's individual claim.

G. By letter dated December 28, 1990, (Plaintiff's Exhibit 13) C & B Farms, Inc., appealed the decision of the State Committee to the Deputy Administrator, State and County Operations, Agricultural and Stabilization Conservation Service, United States Department of Agriculture, Washington, D.C. (DASCO). The DASCO hearing was conducted telephonically. Thereafter, by a letter dated in July, 1991, (Plaintiff's Exhibit 14) DASCO advised that the C & B Farms, Inc., appeal had been denied. This letter contains a detailed summary of the factual findings and conclusions of DASCO which could largely be applicable to Mr. Winchester's individual operation. The letter ended by stating that the administrative appeal rights afforded by 7 CFR Part 780 had been concluded.

## IV.

### CONCLUSIONS

At the hearing on the defendants' motion to dismiss, the County Executive Director, J.R. Boyd, Jr., testified that the facts presented during the C & B Farms, Inc., administrative proceeding would be no different from an administrative proceeding pursued on behalf of Mr. Winchester individually. He also indicated that he had stated at the conclusion of the ASCS County Committee hearing regarding C & B Farms, Inc., that the results regarding Mr. Winchester would "probably" be the same. The court concurs wholeheartedly with this comment.

Even though the bankruptcy had been filed, the ASCS County Committee conduct-

ed a hearing regarding both farm 425 and farm 738 and rendered unfavorable decisions against not only C & B Farms, Inc., but also Mr. Winchester. Subsequently, because of the legal effects of the automatic stay, the ASCS Regional Attorney or the State Executive Director concluded that the hearing regarding Mr. Winchester was a nullity. Regardless, the fact that such a hearing was conducted with an unfavorable decision is evidence that revisiting this "stop" in the administrative processes would be an inevitable waste of time.

As a result of the three unfavorable decisions rendered in the C & B Farms, Inc., proceeding, the County Committee, the State Committee, and DASCO clearly implied that Mr. Winchester's claim would likewise be rejected. The exhibits conclusively establish that the arguments previously offered on behalf of C & B Farms, Inc., would be identical to the arguments that would be offered on behalf of Mr. Winchester. Indeed, in order to render a decision favorable to Mr. Winchester, the decisions rendered against C & B Farms, Inc., at each rung of the administrative ladder, would have to be reversed. This court does not perceive this to be even a remote possibility. The DASCO conclusion underscores this point: (Plaintiff's Exhibit 14)

> You implied the letters by experts from the Extension Service and the Mississippi State Seed Testing Laboratory (identified in facts 2 and 3) support the management practices followed by C & B Farms, Inc. This implication ignores the obvious fact that the writers of both letters considered the rice fields had been flushed and reflushed when they had not.
>
> You acknowledge the flushing of rice fields is a normal management and cultural practice, yet imply it is not necessary in a year acknowledged by your client as being a drought year. In the memorandum attached to your April 12, 1991, letter (page 5) you wrote "The intensive land preparations required of C and B depleted the soil of moisture more than normally would have resulted from land preparation." You continued referencing 3 weeks of additional drought

with soaring temperatures resulting in different conditions than those experienced by neighbors. The combination of depleted soil moisture, drought and soaring temperatures strongly indicates the need to flush the rice to achieve germination.

> The October 5, 1989, reconsideration decision letter to *C.E. Winchester* stated in item number 9, "There were 107 rice farms in Quitman County in 1988 with 16,400 acres planted and 237 acres failed on the other 105 farms. *Mr. Winchester* had the only rice farms that had no harvested production and the failed rice on these farms totals 593.8 acres." The fact flushing is a normal management practice and indeed necessary in 1988 is also confirmed by finding of fact numbers 6 and 7. Other farms in the area flushed their rice crops and were successful in rice production in contrast to your client's failure to flush the crop and unsuccessful efforts to produce a crop. (emphasis added)
>
> The October 5, 1989, letter in addition to the flushing issue indicated in item numbers 4 and 6 (in reference to the July 18, 1988, field visit) that the entire crop had been "abandoned" and "vegetation *on both farms* was so bad that rice could not be identified without walking into the field." (emphasis added)
>
> DECISION
>
> The appeal is denied. C and B Farms, Inc., failed to follow the management practices necessary to produce a rice crop; therefore, the yield reduction for 1988 program purposes will remain as established. We have determined that the loss in 1988 rice crop production was the result of causes other than disaster conditions and that the yield reduction was appropriate and in accordance with regulations.

Mr. Winchester is now deceased, so the prosecution of his claim, whether through the administrative processes or in a judicial forum, must be undertaken by his widow. To require her to go through the administrative processes at this juncture would literally add insult to injury. For all practical purposes, the administrative pro-

cesses, which would be applicable to Mr. Winchester's claim, have been exhausted as a result of the various hearings and appeals in the C & B Farms, Inc., proceeding.

Requiring Mrs. Winchester to again work through the administrative "hoops" is a meaningless exercise. The outcome of these processes is a foregone conclusion. Urging that this cause of action be dismissed until Mrs. Winchester has exhausted her administrative remedies is a tactic, albeit within the law, employed to frustrate and/or discourage her effort.

Mrs. Winchester is a debtor in bankruptcy. The proof is uncontradicted that she has no funds to support a revisitation of the administrative processes, particularly when the "bottomline" of such a revisitation is so predictable. In the parlance of the ballplayer ... it's time now to place these parties on a level playing field.

Therefore, the court is of the opinion that Mrs. Winchester has established beyond peradventure that this proceeding falls within at least two of the exceptions to the doctrine that administrative remedies must be exhausted before proceeding in a judicial forum, i.e., (1) the futility of the administrative processes; and (2) the irreparable harm caused to the debtor as a result of being required to exhaust her available administrative remedies. As such, the motion to dismiss filed by the defendants is not well taken and will be overruled by a separate order to be entered contemporaneously herewith.