701 F.2d 632
 19 ERC 1006, 13 Envtl. L. Rep. 20,648
 CITY OF WEST CHICAGO, ILLINOIS, Petitioner,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION, Respondent,
Kerr-McGee Chemical Corporation, Intervening Respondent.
CITY OF WEST CHICAGO, Plaintiff-Appellant,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION, Kerr-McGee
Chemical Corporation and R.G. Page, Defendants-Appellees.
 Nos. 82-1575, 82-1684.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 8, 1982.
Decided March 1, 1983.
 
 Bruce R. Kelsey, Harold J. Spelman & Asso., West Chicago, Ill., for plaintiff-appellant.
 G. Paul Bollwerk, III, U.S. Nuclear Regulatory Com'n, Washington, D.C., John C. Berghoff, Jr., Chadwell, Kayser, Ruggles, McGee & Hastings, Ltd., Chicago, Ill., for defendants-appellees.
 Before CUMMINGS, Chief Judge, BAUER, Circuit Judge, and GRANT, Senior District Judge.*
 CUMMINGS, Chief Judge.
 
 
 1
 This appeal by the City of West Chicago (City) consolidates review of two orders. Petitioner first challenges a Nuclear Regulatory Commission (NRC) order of February 11, 1982, granting to Kerr-McGee Corporation (KM) a license amendment (Amendment No. 3) authorizing demolition of certain buildings at KM's West Chicago facility, and acceptance for on site storage of contaminated soil from offsite locations. In the Matter of Kerr-McGee Corp. (West Chicago Rare Earth Facility), 15 NRC 232 (1982). The second challenge is to a district court order of April 5, 1982 dismissing plaintiff's mandamus suit for lack of subject-matter jurisdiction. City of West Chicago v. NRC, 542 F.Supp. 13 (N.D.Ill.1982). We uphold the NRC order in No. 82-1575 and affirm the district court's dismissal order in No. 82-1684.
 
 I. Facts
 
 2
 KM operated a milling facility in West Chicago for the production of thorium and thorium compounds from 1967 to 1973. Although the plant closed in 1973, there is presently on site approximately 5 million cubic feet of contaminated waste material consisting of building rubble, contaminated soil, and tailings from the milling of thorium ore. The NRC has been studying KM's proposed plan to decommission the site--ultimately dispose of the tailings and other contaminated materials--since submission of the plan in August 1979. In December 1979 the NRC staff published a notice of intent to prepare a draft environmental impact statement (EIS) to discuss the KM plan for interment of wastes onsite. 44 Fed.Reg. 72246 (Dec. 13, 1979). The draft was issued for comment in May 1982 (NRC Br. at 4).
 
 
 3
 The current NRC license for the West Chicago site is a "source material" license issued pursuant to NRC regulations, 10 C.F.R. Part 40, and authorizing KM to possess and store thorium ores.[1] In March 1980 and March 1981 KM submitted emergency requests to demolish Buildings Nos. 1 and 3 at the West Chicago site. On April 24, 1981, the NRC staff granted these requests as Amendment No. 1 to KM's existing license. Amendment No. 3, which is the focus of the City's suit challenging the NRC order, was issued in September 1981 and allowed demolition of six additional buildings on site in a non-emergency situation. Amendment No. 3 also authorized receipt and storage on site of contaminated material that was formerly taken from the site for use as landfill.
 
 
 4
 On October 14, 1981, the City brought suit challenging the issuance of Amendment No. 3 as well as the NRC's delay in adopting a final decommissioning plan for the site and issuing an EIS for the plan. The City requested the district court to set aside Amendment No. 3, claiming, inter alia, that the amendment violated the National Environmental Policy Act (NEPA) because no EIS was issued before approval, and that the City had no notice of KM's request for the amendment and consequently had no opportunity to request a hearing. The City also sought an order compelling NRC to issue an EIS for, and to take final action on KM's proposed plan for decommissioning and stabilization of the site. Judge McGarr temporarily enjoined KM's activities under the amendment and ordered the NRC to give notice to the City and consider any request for hearing that the City might make (Rec.Doc. No. 16). NRC did so, and on February 11, 1982, issued its order denying the City's request for a formal, trial-type hearing, addressing the contentions raised by the City in the written materials it submitted, and issuing Amendment No. 3. 15 NRC 232. Meanwhile, the City filed a preliminary injunction motion raising the same claims in the district court. On April 5 the district court dismissed the City's motion for a preliminary injunction for lack of subject-matter jurisdiction, holding that the court of appeals had exclusive jurisdiction over any challenges to Amendment No. 3 now that NRC had taken final action on it; and that the claims that NRC acted improperly in not having issued an EIS or a final amendment adopting a decommissioning plan for the West Chicago facility were not ripe for judicial determination, since they related to an amendment not yet issued. 542 F.Supp. 13. The district court denied the City's motion to stay its April 5 order (Rec.Doc. No. 61) and this Court denied both the City's motion to stay the district court order and its motion to stay Amendment No. 3 pending appeal, City of West Chicago v. NRC, No. 82-1575 and No. 82-1684 (May 13, 1982).
 
 II. Review of the NRC order
 
 5
 The City challenges the NRC order, 15 NRC 232 (1982), on both procedural and substantive grounds, contending first, that the NRC violated its own regulations, the Atomic Energy Act, due process, and the National Environmental Policy Act (NEPA) in issuing Amendment No. 3, and second, that the order must be set aside because it is both unsupported by substantial evidence in the record and arbitrary and capricious. We address the procedural issues first.
 
 
 6
 A. The NRC order cannot be set aside on procedural grounds.
 
 
 7
 The Atomic Energy Act of 1954 (AEA), Sec. 189(a), 42 U.S.C. Sec. 2239(a), clearly requires NRC to grant a "hearing" if requested "[i]n any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit * * *."[2] The parties in this case are arguing about the kind of "hearing" the NRC is required to conduct when issuing an amendment to a source materials license. The City argues that NRC must hold a formal, adversarial, trial-type hearing as provided by NRC regulations, 10 C.F.R. Secs. 2.104 and 2.105. We shall refer to the hearing process outlined in those Sections as a "formal hearing." NRC and intervenor KM argue that the NRC may hold an informal hearing in which it requests and considers written materials without providing for traditional trial-type procedures such as oral testimony and cross-examination. We shall refer to this kind of hearing as an "informal hearing."[3] In the circumstances of this case, we find that an informal hearing suffices.
 
 
 8
 1. NRC did not violate its own regulations.
 
 
 9
 Under Commission regulations, a formal hearing is triggered by either a notice of hearing under 10 C.F.R. Sec. 2.104 or a notice of proposed action under Sec. 2.105. The City argues that both regulations require the Commission to hold a formal hearing in this case.
 
 
 10
 Section 2.104 provides that a notice of hearing will issue when "a hearing is required by the Act or this chapter [10 C.F.R. ch. 1] or [when] the Commission finds that a hearing is required in the public interest."[4] The City argues that NRC must issue a notice of hearing because the first sentence of Section 189(a) of the AEA requires a hearing upon the request of an interested party. See supra note 2. NRC however offers a narrower interpretation of the phrase "required by the Act" in Section 2.104. It contends that a formal hearing is "required by the Act" within the meaning of Section 2.104 when the AEA mandates a hearing even absent a request for one; in other words, even when a proceeding under Section 189(a) will be uncontested. The second sentence of Section 189(a) provides that NRC shall automatically hold a hearing on certain applications for a construction permit even absent a request for a hearing. The first sentence of Section 189(a) on the other hand requires NRC to grant a hearing only upon the request of an interested person. By distinguishing the two sentences in this manner, NRC interprets Section 2.104 to "require" a hearing only in cases falling under the second, rather than the first sentence. Because a materials license amendment clearly falls within the first sentence of Section 189(a), it does not, we hold, trigger the Section 2.104 notice of hearing, or the formal procedures provided therein.
 
 
 11
 The City argues next that the notice of hearing under Section 2.104 is triggered in this case by Section 2.105 of "this chapter."[5] See supra note 4. Yet consistent with its interpretation of the words "required by the Act" in Section 2.104, NRC contends that nothing in chapter 1 requires a hearing in the sense of mandating one even absent a request. 15 NRC at 245. Far from mandating a hearing even absent a request, Section 2.105 provides only that notice of proposed action--also called notice of opportunity for a hearing--will issue in certain circumstances. If no hearing is requested, none will be held. 10 C.F.R. Sec. 2.105(e)(1). NRC agrees that a party who requests a hearing pursuant to the notice of opportunity for a hearing issued under Section 2.105 is entitled to a notice of hearing under Section 2.104 and a formal hearing will be convened. 15 NRC at 246; see also NRC Br. at 15 n. 9. However, Section 2.105 by its own terms requires issuance of a notice of proposed action only in limited circumstances, for example, with respect to an application for or an amendment of a facility license, 10 C.F.R. Sec. 2.105(a)(1), (a)(3), a license for "receipt of waste radioactive material from other persons for the purpose of commercial disposal by the waste disposal licensee," id. Sec. 2.105(a)(2), (a)(3), a license to receive high-level radioactive waste at a geologic repository operations area, id. Sec. 2.105(a)(4), or a license "as to which the Commission determines that an opportunity for a public hearing should be afforded," id. Sec. 2.105(a)(6). The City argues that Amendment No. 3 effectively licenses KM to receive offsite thorium for commercial disposal under Section 2.105(a)(2). By its terms Section 2.105(a)(2) requires notice of proposed action as to (1) commercial disposal, which this is not, since KM is only a temporary storage site and is apparently not being reimbursed or otherwise compensated for its actions (Admin.Rec., Vol. 6, Doc. No. 7), (2) by a waste disposal licensee, such as those licensed at Hanford, Washington, or Barnwell, South Carolina. KM, to the contrary, operates under a source materials license, rather than under a license for a commercial waste disposal site, and had no intention of changing its status, id.
 
 
 12
 Finally, the City argues that NRC should have found that the "public interest" required a formal hearing, 10 C.F.R. Sec. 2.104(a); id. Sec. 2.105(a)(6). We note that the determination of whether the public interest requires a hearing is left to NRC's discretion, and find that in this case, NRC had ample cause to reject the City's argument.
 
 
 13
 First, counsel for the City agreed at oral argument that all the buildings at the West Chicago site did have to come down. The City did not object to the issuance of Amendment No. 1 in April 1981 allowing demolition of Buildings Nos. 1 and 3. In granting Amendment No. 3, the NRC staff indicated that its conclusion was based on its earlier favorable review of KM's demolition plan under Amendment No. 1, covering project management, employee training, and radiological and health and safety effects, as well as several site visits made to view the Amendment No. 1 demolition in progress (Admin.Rec., Vol. 6, Doc. No. 4). The staff specifically determined that the prior demolition work was done in a safe manner. Having concluded that the prior demolition work posed no threat to the public health or safety or to the environment, and that Amendment No. 3 would pose no new technical or safety problems, NRC could reasonably have concluded that the "public interest" did not require a formal hearing on Amendment No. 3.
 
 
 14
 Second, with respect to the receipt of offsite materials, the NRC staff concluded that the materials would not constitute a danger to the public health and safety and that there was no need to exercise licensing authority over them. See 10 C.F.R. Part 71. The staff also found that receipt of such a relatively small amount of offsite materials would present no unusual technical problems or safety, health, or environmental concerns, and would not increase the problems of decommissioning and storage or disposal of wastes (Admin.Rec., Vol. 6, Doc. No. 4). In addition, Amendment No. 3 only authorized storage of the materials temporarily; a decision regarding disposal could be made at a later date, subject to further review. 15 NRC at 258. Based on these staff reports, NRC could reasonably have concluded that the public interest was served without a formal hearing.[6]
 
 
 15
 Thus no formal hearing was required under NRC's interpretation of 10 C.F.R. Secs. 2.104 and 2.105. When a court is called upon to construe administrative regulations, "[t]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, quoted in First Bank v. Avenue Bank and Trust Co., 605 F.2d 372, 376 (7th Cir.1979). Although NRC's interpretation of its regulations is at times somewhat convoluted, it is not plainly erroneous or inconsistent with the text of the regulations. We therefore hold that NRC acted in conformance with its regulations in denying the City a formal hearing.
 
 
 16
 2. NRC did not violate the Atomic Energy Act.
 
 
 17
 Our inquiry cannot end with a finding that the NRC acted in conformance with its own regulations, for we must determine whether those regulations as interpreted violate the governing statute. If the AEA requires a formal hearing in the case of a materials license amendment, then the NRC must provide one, despite its interpretation of the regulations.
 
 
 18
 The City claims that a materials licensing hearing under Section 189(a) of the AEA must be in accordance with Section 5 of the Administrative Procedure Act (APA), 5 U.S.C. Sec. 554. Section 554 does not by its terms dictate the type of hearing to which a party is entitled; rather it triggers the formal hearing provisions of Sections 556 and 557 of the APA if the adjudication in question is required by the agency's governing statute to be "determined on the record after opportunity for an agency hearing * * *."[7] United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 757, 92 S.Ct. 1941, 1950, 32 L.Ed.2d 453. The City argues that Section 189(a) of the AEA triggers the formal hearing provisions of the APA because it provides that the "Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding." See supra note 2.
 
 
 19
 Although Section 554 specifies that the governing statute must satisfy the "on the record" requirement, those three magic words need not appear for a court to determine that formal hearings are required. See, e.g., Seacoast Anti-Pollution League v. Costle, 572 F.2d 872, 876 (1st Cir.), certiorari denied sub nom. Public Serv. Co. v. Seacoast Anti-Pollution League, 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978); Marathon Oil Co. v. EPA, 564 F.2d 1253, 1263 (9th Cir.1977). However, even the City agrees that in the absence of these magic words (Br. at 24), Congress must clearly indicate its intent to trigger the formal, on-the-record hearing provisions of the APA. United States Lines v. FMC, 584 F.2d 519, 536 (D.C.Cir.1978); Nofelco Realty Corp. v. United States, 521 F.Supp. 458, 461-462 (S.D.N.Y.1981); see also United States v. Florida East Coast Ry., 410 U.S. 224, 234-238, 93 S.Ct. 810, 815-18, 35 L.Ed.2d 223; United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 756-758, 92 S.Ct. 1941, 1950, 32 L.Ed.2d 453. We find no such clear intention in the legislative history of the AEA, and therefore conclude that formal hearings are not statutorily required for amendments to materials licenses.
 
 
 20
 The parties agree that the legislative history of the 1954 AEA sheds little light on the hearing requirement of the first sentence of Section 189(a). City Br. at 18; 15 NRC at 247. While Section 181 of the AEA made the provisions of the APA applicable to all agency actions, S.Rep. No. 1699, 83d Cong., 2d Sess., reprinted in 1954 U.S.Code Cong. & Ad.News 3456, 3483, it did not specify the "on the record" requirement necessary to trigger Section 554 of the APA. Thus despite the fact that the statute required the Commission to grant a hearing to any materially interested party, there is no indication that Congress meant the hearing to be a formal one.[8] Similarly, the legislative history of the 1957 and 1962 amendments to the AEA shows little concern with the procedures required by the hearing provision in the first sentence of Section 189(a). Rather, Congress was concerned mainly with facilities or reactor licenses as opposed to the source, special nuclear, or byproduct materials licenses covered under the first sentence of Section 189(a). See Staff of Joint Comm. on Atomic Energy, 87th Cong., 1st Sess., Improving the AEC Regulatory Process (Comm.Print 1961); Radiation Safety & Regulation: Hearings before Joint Comm. on Atomic Energy, 87th Cong., 1st Sess. (1961); AEC Regulatory Problems, Hearings before Subcomm. on Legislation of the Joint Comm. on Atomic Energy, 87th Cong., 2d Sess. (1962).
 
 
 21
 In adopting rules to carry out the AEA, however, the Atomic Energy Commission (AEC) did provide by regulation for formal hearings on request in all licensing cases. 10 C.F.R. Secs. 2.102, 2.708, 21 Fed.Reg. 804 (Feb. 4, 1956). The agency did not indicate whether the formal hearings were a matter of discretion or statutory mandate. In 1957, the Act was amended to add the second sentence of Section 189(a), mandating a hearing on certain applications for construction permits even when uncontested. Again, the type of hearing to be held was left undefined. After the 1957 amendment took effect, there was a significant amount of criticism of the AEC for overformalizing the licensing process. The staff of the Joint Committee on Atomic Energy published a report criticizing the AEC for going "further in some respects than the law required, particularly in regard to the number of hearings required and the formality of procedures." 1 Improving The AEC Regulatory Process viii. With respect to materials licenses, the Joint Committee staff suggested registration rather than licensing of materials, though it did recommend hearings before a hearing examiner in contested materials licensing cases. Id. at 73. The Joint Committee then held hearings to explore legislative improvements to the AEC regulatory process. Although witnesses debated whether Section 189(a) of the AEA required formal procedures in licensing cases, the Joint Committee did not resolve the issue. Instead, the Committee concentrated mainly on reactor licensing, and in 1962 proposed amendments that established licensing boards, 42 U.S.C. Sec. 2241, and dispensed with the mandatory hearing requirement in uncontested operating license, but not construction permit, proceedings. See supra note 2.
 
 
 22
 The AEC continued to hold formal hearings in all contested reactor cases, as well as in materials licensing cases. However, based on the threadbare legislative history concerning materials licenses, we are unable to conclude that the AEC's procedures were mandated by statute. Even if the legislative history indicates that formal procedures are required by statute in reactor licensing cases under the second, third, and fourth sentences of Section 189(a), we do not accept the City's argument that this by necessity indicates that all hearings under the first sentence must be formal as well (City Br. at 20).[9] While the first sentence of Section 189(a) speaks in terms of "any license or construction permit," it does so in the context of a statute that distinguishes between the licensing of nuclear materials and reactor facilities. See, e.g., 42 U.S.C. Secs. 2071-2078 (licensing of special nuclear material); id. Secs. 2091-2099 (licensing of source material); id. Secs. 2111-2114 (licensing of byproduct material); id. Secs. 2131-2141 (licensing of commercial and test reactor facilities). In this case, we have no difficulty ascribing different meanings to the word "hearing" even though it appears in succeeding sentences of the same statutory section.
 
 
 23
 The City argues that under the APA, agency action is classified either as rulemaking or adjudication, and since licensing is adjudication, NRC is obliged to provide a formal hearing in this case. The "on the record" requirement of APA Section 554, according to the City has been relevant primarily in cases involving rulemaking, not adjudication, e.g., United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 92 S.Ct. 1941, 32 L.Ed.2d 453; United States v. Florida East Coast Ry., 410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223; in adjudication, the City claims the absence of the "on the record" requirement is not decisive.[10] For example, Section 402 of the Federal Water Pollution Control Act (FWPCA), 33 U.S.C. Sec. 1342(a)(1), which provides for a "public hearing," has been held by three courts including this one to require a formal hearing pursuant to Section 554. Seacoast Anti-Pollution League v. Costle, 572 F.2d 872 (1st Cir.), certiorari denied sub nom. Public Serv. Co. v. Seacoast Anti-Pollution League, 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978); Marathon Oil Co. v. EPA, 564 F.2d 1253 (9th Cir.1977); United States Steel Corp. v. Train, 556 F.2d 822 (7th Cir.1977). The First Circuit relied principally on the adjudicative nature of the decision at issue--issuance of a permit to allow discharge of a pollutant--finding that primarily the rights of the particular applicant would be affected, and that resolution of the issues required specific factual findings by the EPA Administrator. Seacoast Anti-Pollution League v. Costle, supra at 876. The court also mentioned the judicial review provision of Section 509 of the FWPCA, which provides for review of a determination required under the FWPCA to be made "on the record." Id. at 876 n. 6. The Ninth Circuit in Marathon Oil Co. v. EPA, 564 F.2d 1253, relied principally on the judicial review provision, id. at 1263, though it also found that the "setting of effluent limitations under section 402 of the [Federal Water Pollution] Control Act * * * falls squarely within the mainstream of traditional adjudications," id. This Court in United States Steel Corp. v. Train, 556 F.2d 822, relied principally on the judicial review provision of Section 509, but also found that Section 558(c) of the APA mandated a formal hearing independently of Section 554. Section 558(c) provides:
 
 
 24
 [w]hen application is made for a license required by law, the agency, with due regard for the rights and privileges of all the interested parties or adversely affected persons and within a reasonable time, shall set and complete proceedings required to be conducted in accordance with sections 556 and 557 of this title or other proceedings required by law and shall make its decision.
 
 
 25
 This Court held in Train that the FWPCA Section 402 application was a license application proceeding and that the applicant was entitled to a formal hearing under APA Sections 556 and 557.
 
 
 26
 The First, Fifth and Ninth Circuits rejected the Section 558(c) analysis of this Circuit, see Seacoast, 572 F.2d at 878 n. 11 and Marathon Oil, 564 F.2d at 1260-1261 n. 25; see also Taylor v. District Engineer, United States Army Corps of Engineers, 567 F.2d 1332, 1337 (5th Cir.1978). After reconsideration, we have decided herein to abandon our position in Train insofar as we relied on APA Section 558(c) to order a formal hearing. See Gallagher & Ascher Co. v. Simon, 687 F.2d 1067, 1074-1075 (7th Cir.1982). We now agree with the First, Fifth and Ninth Circuits that Section 558(c) does not independently provide that formal adjudicatory hearings must be held. "It merely requires any adjudicatory hearings mandated under other provision of law to be set and completed in an expeditious and judicious manner." Marathon Oil, 564 F.2d at 1260-1261 n. 25.
 
 
 27
 All three cases, however, relied at least in part on the presence of the "on the record" requirement in Section 509, indicating that the requirement is indeed relevant to defining the hearing process even in adjudication. Insofar as we relied on the judicial review provision of Section 509, we need not reconsider our holding in Train because it is distinguishable from the case at bar. Judicial review of NRC action is governed by a general jurisdictional grant in Section 189(b) of the AEA, 42 U.S.C. Sec. 2239(b). See supra note 2. Unlike the "on the record" requirement of Section 509 of the FWPCA, there is no indication even in the judicial review Section of the AEA, the governing statute, that Congress intended to require formal hearings under the APA.
 
 
 28
 Thus even in adjudication, the "on the record" requirement is significant at least as an indication of congressional intent. We agree with the courts and commentators who recognize that adjudication may be either informal or formal. See S. Breyer & R. Stewart, Administrative Law and Regulatory Policy 481, 524-526 (1979); K. Davis, Administrative Law Treatise Sec. 12:10, at 447-454 (2d ed. 1979); Verkuil, A Study of Informal Adjudication Procedures, 43 U.Chi.L.Rev. 739, 739 n. 1 (1976); see also Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136; Izaak Walton League v. Marsh, 655 F.2d 346, 361-362 n. 37 (D.C.Cir.1981), certiorari denied sub nom. Atchison, Topeka & Santa Fe Ry. v. Marsh, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630. Formal adjudications are those required by statute to be conducted through on-the-record proceedings. Informal adjudications constitute a residual category including "all agency actions that are not rulemaking and that need not be conducted through 'on the record' hearings." Izaak Walton League v. Marsh, supra at 361-362 n. 37.[11] For example, in United States Lines v. FMC, 584 F.2d 519 (D.C.Cir.1978), the court considered the hearing requirement of Section 15 of the Shipping Act of 1916, 46 U.S.C. Sec. 814. Under Section 15, the Commission may grant exemptions from the antitrust laws for anticompetitive agreements among ocean carriers when it is in the public interest to do so. Id. In analyzing the procedures necessary for a fair hearing, the court found that the case did not involve an adjudication in the constitutional sense, described in Sangamon Valley Television Corp. v. United States, 269 F.2d 221, 224 (D.C.Cir.1959), as a "resolution of conflicting private claims to a valuable privilege." Neither did it involve notice and comment rulemaking under APA Section 553. Rather the court characterized the case as involving an issue "quasi-adjudicatory" in nature--an adjudication of the rights of certain named parties to an exemption from the antitrust laws in light of the public interest. 584 F.2d at 539-540. This kind of agency action, though quasi-adjudicatory, was not intended by Congress to merit a formal hearing under Section 15 of the Shipping Act, id. at 536-537. See also Sea-Land Serv., Inc. v. FMC, 653 F.2d 544, 551 (D.C.Cir.1981); Marine Space Enclosures, Inc. v. FMC, 420 F.2d 577, 589-590 (D.C.Cir.1969); Nofelco Realty Corp. v. United States, 521 F.Supp. 458, 461-462 (S.D.N.Y.1981); United States v. Independent Bulk Transport, Inc., 480 F.Supp. 474, 478-479 (S.D.N.Y.1979).
 
 
 29
 Despite the fact that licensing is adjudication under the APA, there is no evidence that Congress intended to require formal hearings for all Section 189(a) activities. In light of the above analysis, we conclude that NRC did not violate the AEA when it denied the City's request for a formal hearing.[12]
 
 
 30
 3. NRC hearing procedures satisfy the requirements of due process.
 
 
 31
 The City argues that the NRC proceedings deprived it of liberty or property interests without due process of law. Yet generalized health, safety and environmental concerns do not constitute liberty or property subject to due process protection. See, e.g., Izaak Walton League v. Marsh, supra at 361; Gasper v. Louisiana Stadium & Exposition District, 418 F.Supp. 716, 720-721 (E.D.La.1976), affirmed, 577 F.2d 897 (5th Cir.1978), certiorari denied, 439 U.S. 1073, 99 S.Ct. 846, 59 L.Ed.2d 40. Although the City claims that it has presented "specific documented concerns" to the NRC in its petitions (Br. at 28), such "concerns" do not, without more, require due process protection.
 
 
 32
 Even if we were to find a protected liberty or property interest in this case, we would hold that Commission procedures constituted sufficient process. The City received a meaningful opportunity to submit statements and data explaining why the amendment should not be granted. See See-Land Service, Inc. v. FMC, 653 F.2d 544, 551 (D.C.Cir.1981). On October 27, 1981 the City filed four petitions for hearing with the NRC (Admin.Rec., Vol. 1, Docs. Nos. 1-5). NRC responded on November 5 by requesting that the City submit to NRC and serve on KM any information relating to the health, safety or environmental effects of issuing Amendment No. 3 (Admin.Rec., Vol. 1, Doc. No. 6). The City responded on November 13 with a list of six contentions (Admin.Rec., Vol. 1, Doc. No. 7), all of which KM denied (Admin.Rec., Vol. 1, Doc. No. 8). NRC addressed another letter to both parties asking KM to respond to the City's two factual allegations and offering the City a chance to respond to KM (Admin.Rec., Vol. 1, Doc. No. 9). KM submitted a detailed rebuttal of the City's contentions with supporting documentary information (Admin.Rec., Vol. 1, Doc. No. 13). The City responded by reiterating its earlier assertions but provided no other factual information (Admin.Rec., Vol. 1, Doc. No. 14).
 
 
 33
 By pressing its request for a formal evidentiary hearing, the City has indicated its belief that written comments and documentation provide an inadequate opportunity to air its concerns. However, we are given no hint by the City of concerns other than the six listed in its November 13 submission to the Commission. Of those six, only two present factual issues, see Part IIB infra, the resolution of which will in large part be based on technical or scientific data that will not necessarily be made more reliable through an oral presentation. Cf. Mathews v. Eldridge, 424 U.S. 319, 344-345, 96 S.Ct. 893, 907, 47 L.Ed.2d 18; Basciano v. Herkimer, 605 F.2d 605, 610-611 (2d Cir.1978). In addition, as in a motion for summary judgment, it appears that both the City and KM essentially agreed on the facts but contested their interpretation, thus alleviating the need for an oral hearing.
 
 
 34
 We find that NRC correctly applied the Mathews v. Eldridge analysis, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18, in its order. 15 NRC at 256-262. The private interest that would be affected by official action in this case is a generalized one; in fact the health, safety and environmental interests of the City appear to be more "public" than "private." Though such interests are, of course, significant in the larger sense, in this case the City itself valued the particular interest involved only minimally since it did not object to the issuance of Amendment No. 1 involving similar procedures. Taking into account the technical, scientific nature of the issues, the absence of credibility questions, and the apparent lack of controverted issues of material fact, the additional value of an oral hearing in this case is minimal. Finally, convening a formal hearing involves a great deal of expense, both for the agency and the parties. According to NRC, 15 NRC at 261,
 
 
 35
 A three-member licensing board or administrative law judge must be appointed, and with that come all the accouterments that make the proceeding more costly in terms of the time and materials expended: e.g., participation in a prehearing conference, preparation of transcripts, discovery, submission of pre-filed testimony, a trial-type hearing at which witnesses are presented and cross-examined, and the preparation of findings of fact and conclusions of law.
 
 
 36
 NRC concluded, and we concur, that in this particular case, the Commission procedures afforded the City all the process that was constitutionally necessary.
 
 
 37
 The City, however, raises another notice problem. The City contends that NRC regulations provide for only one kind of hearing--a formal one. See 10 C.F.R. Secs. 2.104 and 2.105, notes 4 and 5 supra. Despite the provisions in APA Section 552(a) which require that agency procedures be published in the Federal Register, there are no regulations in effect governing any kind of informal hearing. In addition, NRC has admittedly always granted formal hearings on request in materials licensing cases. 15 NRC at 246 n. 12, NRC Br. at 17 n. 11.[13] Therefore the City claims that when it filed its written materials in October and November of 1981, it assumed that these were preliminary to a formal hearing, and that it was prejudiced by lack of notice of the informal hearing. See Transco Sec., Inc. v. Freeman, 639 F.2d 318, 323-324 (6th Cir.1981), certiorari denied, 454 U.S. 820, 102 S.Ct. 101, 70 L.Ed.2d 90.
 
 
 38
 NRC seems to admit it has no regulations governing informal hearings, but argues that in this case at least the City had actual notice of the new procedures and an adequate opportunity to conform to them. APA Section 552(a) provides that persons may not be "required to resort to, or be adversely affected by" a matter which is not published "[e]xcept to the extent that a person has actual and timely notice of the terms thereof." See Human Resources Management, Inc. v. Weaver, 442 F.Supp. 241, 247 (D.D.C.1977). In addition, though an agency may be bound by its own established customs and practices, it may satisfy due process requisites by prior public notice of its new policy or requirements. See Briscoe v. Kusper, 435 F.2d 1046, 1055 (7th Cir.1970).
 
 
 39
 We do not doubt the authority of NRC to change its procedures on a case-by-case basis with timely notice to the parties involved, see NLRB v. Bell Aerospace Co., 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134, but we question the wisdom of doing so without the benefit of published regulations. A review of the documents in this case indicates that the issue of adequate notice is a close one. The November 5, 1981, letter from NRC to the City requested that the City provide "any additional information and arguments it desires that the Commission consider in connection with the license amendment ...." (Admin.Rec., Vol. 1, Doc. No. 6). The final November 25, 1981, letter from NRC urged both KM and the City to "recognize that the Commission is hereby requesting whatever information is now possessed by Kerr-McGee and the City which is relevant to resolving the City's assertions" concerning KM's dust-abatement program (Admin.Rec., Vol. 1, Doc. No. 9). Although these letters are not totally unambiguous, we conclude that the City did have adequate notice that the Commission intended to base its decision on written submissions. Other than the mere allegation of prejudice, there is no evidence in the record that the City would have responded differently if it had a more definite idea of the type or scope of the hearing. See Citizens for Allegan Cty. v. FPC, 414 F.2d 1125, 1134 (D.C.Cir.1969). The City also argues that it received the technical information on the decommissioning activities in KM's December 4, 1981, letter, and was given only one week to respond (Admin.Rec., Vol. 1, Doc. No. 14). However, the City failed to request an extension from NRC and also failed to challenge substantively KM's decommissioning data at any subsequent time. Accordingly, there is no evidence that the City was prejudiced by the one-week notice period.
 
 
 40
 4. NRC did not violate the procedural requirements of NEPA.
 
 
 41
 Section 102(2)(C) of NEPA requires the preparation of an EIS for all "major Federal actions significantly affecting the quality of the human environment * * *." 42 U.S.C. Sec. 4332(2)(C).[14] The Act clearly envisions certain actions for which an EIS is unnecessary. Hanly v. Mitchell, 460 F.2d 640, 644 (Hanly I) (2d Cir.1972), certiorari denied, 409 U.S. 990, 93 S.Ct. 313, 34 L.Ed.2d 256. The agency must make a threshold determination that a particular activity constitutes a "major" federal action with "significant" effects. That determination is reviewable by the courts, and we evaluate NRC's substantive decision not to issue an EIS, infra Part IIB. However, the City also argues that it was not given notice or the opportunity to comment when NRC made its threshold decision not to issue an EIS (Br. at 36). Assuming without deciding that notice and comment procedures are required under NEPA,[15] we find that the City had an adequate opportunity to contribute to NRC's threshold decision not to issue an EIS. The fact that the City argued for an EIS in its petition for hearing before NRC indicates it knew that the issue was under consideration (Admin.Rec., Vol. 1, Doc. No. 1). The City also had ample opportunity to submit data to the Commission during the five- to six-week period in which it filed other written materials.[16] The Commission did not violate the procedural requirements of NEPA, because the City had adequate notice and an opportunity to comment on the Commission's action.
 
 
 42
 B. The Commission did not act arbitrarily or capriciously in issuing Amendment No. 3.
 
 
 43
 The scope of review of agency action is defined in Section 10(e) of the APA, 5 U.S.C. Sec. 706. In certain limited circumstances, as, for example, when a hearing "on the record" is required by statute, a court must set aside agency action when it is not supported by substantial evidence. 5 U.S.C. Sec. 706(2)(E). Otherwise, an agency decision can be set aside if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A). Because the AEA does not require an "on the record" hearing, see supra Part IIA-2, we must apply the "arbitrary and capricious" test to this informal adjudication. See Camp v. Pitts, 411 U.S. 138, 140-142, 93 S.Ct. 1241, 1243, 36 L.Ed.2d 106; Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 414-415, 91 S.Ct. 814, 822, 28 L.Ed.2d 136; United States Lines v. FMC, 584 F.2d 519, 526 (D.C.Cir.1978). Judicial review in accordance with this standard is not toothless: while the agency's decision "is entitled to a presumption of regularity, * * * that presumption is not to shield [its] action from a thorough, probing, in-depth review." Citizens to Preserve Overton Park, Inc., supra at 415, 91 S.Ct. at 823.
 
 
 44
 To facilitate review of informal proceedings in the absence of formal findings of fact and conclusions of law, it is crucial that the agency articulate the reasons for its decision. City Fed. Sav. & Loan Ass'n v. Federal Home Loan Bank Bd., 600 F.2d 681, 688-689 (7th Cir.1979). In the order before this Court, NRC clearly stated its reasons for issuing Amendment No. 3. It relied principally on a staff memorandum evaluating KM's demolition activities under Amendment No. 1 and the potential impacts of Amendment No. 3, and considering the potential consequences of on site storage of the offsite waste materials. (Admin.Rec., Vol. 6, Doc. No. 4). The staff made numerous site visits to view Amendment No. 1 demolition in progress. They concluded that KM's plans under Amendment No. 1 for project management, radiological health and safety and employee training had worked well, and would be adequate for Amendment No. 3 demolition. The buildings were examined during a site visit and it was concluded that there were no factors that would tend to make demolition particularly difficult or hazardous. Offsite impact was monitored during demolition of Building No. 3 under Amendment No. 1 and no significant offsite impact was detected. For Amendment No. 3 activities, KM agreed to install two additional permanent air samplers near the demolition area. The evaluation specifically concluded that KM is performing demolition work in a safe manner.
 
 
 45
 With respect to the offsite materials, the evaluation found that the amount of offsite soil would be minor both in volume and content of radionuclides when compared to wastes currently on site. Acceptance of the offsite wastes would present no unusual technical or safety problems and would not significantly increase the problem of decommissioning and storage or disposal of wastes. Neither demolition nor acceptance of the offsite wastes would prejudice any disposal alternatives which might later be selected.
 
 
 46
 Based on this review of KM's activities and their effect on the public health, safety, and the environment, we cannot say that NRC acted in an arbitrary and capricious manner in issuing Amendment No. 3. In addition, NRC responded thoroughly to each of the six contentions raised by the City in its petitions for hearing. Three of those contentions criticized KM's proposed demolition methods; three were more general criticisms of NRC procedure. It is evident from the NRC order that it took these criticisms into account, and after due consideration, rejected them. We therefore address these contentions only briefly, again concluding that NRC acted within the scope of its authority and in a reasonable manner in granting Amendment No. 3.
 
 
 47
 1. KM's demolition procedures under Amendment No. 3
 
 
 48
 The City's basic argument criticizing KM's procedures is that NRC allowed KM to depart from the terms of its proposed stabilization plan in carrying out Amendment No. 3 (Admin.Rec., Vol. 1, Doc. No. 7, # 1, # 2, # 6). The plan, however, was just a proposal at the time Amendment No. 3 was issued. The procedures and schedule incorporated therein did not bind NRC until final approval. When KM sought approval for decommissioning activities, NRC considered
 
 
 49
 whether allowing such activity is consistent with our rules that provide for protection of the public health and safety and the environment, whether it would preclude or prejudice any disposal option, or whether it would otherwise be inappropriate under the circumstances.
 
 
 50
 15 NRC at 271. The fact that the decommissioning procedures were at variance with those described in the proposed plan did not necessarily invalidate the amendment, when, as indicated above, NRC gave the amendment adequate consideration.
 
 
 51
 In particular, the City contends that KM has failed to use the water-fogging system for dust control described in its proposed plan. Inadequate dust control may result in offsite contamination from airborne radioactive debris. KM's factual submissions show that they used a demolition procedure involving both water and foam, and that the air particle sample station records indicate no detectable increase in airborne radioactivity. Various staff inspection tours confirm that the procedures do not endanger the public health or safety or the environment. The City has produced no evidence to challenge this finding.
 
 
 52
 Similarly, the City alleges that according to the stabilization plan, KM agreed to build a lagoon to contain the water from its demolition activities. Instead, KM uses existing floor trenches to funnel the water to available storage tanks. Since the use of water and foam for dust abatement resulted in less runoff than anticipated, this system is adequate. According to the water monitoring figures, there has been no detectable increase in radiation due to the dust abatement program. Again, the City has produced no evidence to challenge this finding.[17]
 
 
 53
 Based on the evidence submitted by both the City and KM, we cannot conclude that NRC acted arbitrarily in rejecting the City's challenges to KM's procedures under Amendment No. 3. We turn now to the City's more general criticisms of NRC action.
 
 2. Storage of thorium on site
 
 54
 The City argues that the concentration of thorium at the West Chicago site qualifies it for consideration under proposed Option 5, which states that "long term disposal other than at a licensed disposal site will not normally be a viable option * * *." 46 Fed.Reg. 52063 (Oct. 23, 1981). However, the "Option" was not final at the time; there has been no decision as of yet as to long-term disposal of the wastes at the site; and the following sentence of the proposed Option 5 allows storage "onsite under an NRC license until a suitable method of disposal is found." Id. Option 5 presents no obstacle to NRC's issuance of Amendment No. 3.
 
 3. Failure to obtain city building permits
 
 55
 The City argues that KM must obtain city building demolition permits before implementing Amendment No. 3. However, the City has taken no action to assert its regulatory authority, and NRC need not abstain from acting until it does. See In the Matter of Cleveland Electric Illuminating Co. (Perry Nuclear Power Plant, Units 1 and 2), 6 NRC 741, 748 (1977); In the Matter of Southern California Edison Co. (San Onofre Nuclear Generating Station, Units 2 and 3), 7 AEC 410, 412 (1974). This argument presents no obstacle to the issuance of Amendment No. 3.
 
 4. Failure to file an EIS
 
 56
 The parties agree that NEPA, 42 U.S.C. Sec. 4332(2)(C), requires issuance of an EIS before approval of KM's overall decommissioning and stabilization plan for the West Chicago site; such a plan clearly will have a significant impact on the environment. See supra note 14. The City argues that by issuing Amendment No. 3 without an EIS and before final approval of the overall KM decommissioning plan, NRC illegally segmented the overall plan.
 
 
 57
 "Piecemealing" or "segmentation" allows an agency to avoid the NEPA requirement that an EIS be prepared for all major federal action with significant environmental impacts by segmenting an overall plan into smaller parts involving action with less significant environmental effects. City of Rochester v. United States Postal Serv., 541 F.2d 967, 972 (2d Cir.1976). In Kleppe v. Sierra Club, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576, the Supreme Court articulated the appropriate standard of review by which to evaluate an agency's decision not to issue an EIS in a context similar to this one. In Kleppe, the Department of the Interior approved several coal-related projects in the Northern Great Plains without preparing a comprehensive EIS on all the proposed projects in the region. The Court held that the agency did not act arbitrarily in refusing to prepare a comprehensive EIS on the entire region; indeed the Court said that even if "a regional impact statement was due at that moment, [the Court of Appeals] would have erred in enjoining approval of the four mining plans unless it had made a finding that the impact statement covering them inadequately analyzed the environmental impacts of, and the alternatives to, their approval." Id. at 407-408 n. 16, 96 S.Ct. at 2729 n. 16. As long as the agency does not act arbitrarily in refusing to prepare an EIS, the decision lies in its discretion. Id. at 412, 96 S.Ct. at 2731.
 
 
 58
 In Kleppe, the agency had in fact issued an EIS on each individual mining project but had refused to issue a regional EIS. In this case, the agency decided against issuing an EIS for the component part of the plan, and in fact issued a draft EIS for the overall plan. We do not think this difference changes the analysis. The Supreme Court was concerned in Kleppe with the reasonableness of the environmental decision, whatever it might be, with respect to the region, as well as with respect to each component part of the project; it was not mandating an EIS for each component part of a plan. Therefore the Kleppe analysis still applies even though NRC decided against issuing an EIS for Amendment No. 3. If that decision was not arbitrary or capricious, it must be upheld.[18]
 
 
 59
 This Circuit has always followed the rule that an agency's decision not to issue an EIS for an activity it claims has an insignificant impact may be reversed by a court if it is arbitrary or capricious. Assure Competitive Transp., Inc. v. United States, 635 F.2d 1301, 1308 (1980); Nucleus of Chicago Homeowners Ass'n v. Lynn, 524 F.2d 225, 229 (1975), certiorari denied, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734; First Nat'l Bank v. Richardson, 484 F.2d 1369, 1381 (1973). This threshold decision not to issue an EIS must be supported by a record sufficiently developed to permit judicial review. Assure Competitive Transp., supra at 1308 n. 7. Despite the fact that NRC rules do not require it to publish the results of its environmental investigation in an EIS, a negative declaration or an environmental impact appraisal, see 10 C.F.R. Sec. 51.5(d)(4),[19] there is still before us an adequate record to review. NRC explained the reasons for its determination both in the background document to Amendment No. 3 (Admin.Rec., Vol. 6, Doc. No. 4) and in its order of February 11, 1982, 15 NRC 232, 263-265. As discussed above, supra at 26-27, the decision was based on an evaluation of past activities under Amendment No. 1, onsite inspection reports, and the considered judgment, uncontradicted by any evidence offered by the City,[20] that Amendment No. 3 activities would not affect radioactivity levels in the surrounding air or water. In addition, the agency's decision to allow demolition of the buildings would not prejudice the selection of a permanent disposal plan for which a draft EIS had already issued. In deciding not to issue an EIS for Amendment No. 3, NRC took the requisite "hard look" at the environmental impact of its action, Kleppe, supra at 410 n. 21, 96 S.Ct. at 2730 n. 21. Based on the record before us, we cannot conclude that the Commission acted arbitrarily in deciding not to issue an EIS for Amendment No. 3.
 
 III. Review of the district court order
 
 60
 After NRC issued its February 1982 order, the district court dismissed the City's motion for a preliminary injunction. 542 F.Supp. 13. The court found, first, that Counts V-XII of the City's complaint were in effect challenges to the license amendment, and that under 28 U.S.C. Sec. 2342(4), the court of appeals is the exclusive forum for review of final NRC orders entered in any proceeding for the granting, suspending, revoking, or amending of any license, 42 U.S.C. Sec. 2239. See Rockford League of Women Voters v. NRC, 679 F.2d 1218, 1221 (7th Cir.1982); Natural Resources Defense Council, Inc. v. NRC, 606 F.2d 1261, 1264-1266 (D.C.Cir.1979). The City apparently agrees that the NRC order was a final one reviewable exclusively in this Court (City Br. at 40).[21]
 
 
 61
 Second, the district court found that Counts I-IV were not ripe for judicial review. Those Counts asked the court to exercise its mandamus power to compel NRC compliance with NEPA. When there has been no final agency action permitting review in the court of appeals, we may assume that the district court has jurisdiction to order declaratory or injunctive relief if the NRC violates a clear, non-discretionary legal duty contained in NEPA, and there is no other adequate remedy. Gage v. AEC, 479 F.2d 1214, 1222 (D.C.Cir.1973); Izaak Walton League v. Schlesinger, 337 F.Supp. 287, 291 (D.D.C.1971). It is evident from the face of the complaint that NRC is in the process of complying with NEPA; it has in fact issued a draft EIS on KM's proposed decommissioning and stabilization plan. Yet because the City requests the court to order NRC to complete both the EIS and the plan by a "date certain," their real complaint seems to be that NRC is improperly delaying the EIS and the final proposal.[22]
 
 
 62
 Although there are no express time limits in NEPA, we may assume that a district court has jurisdiction to compel agency action if NRC unreasonably delays issuing an EIS. Here, however, the City faces a different roadblock: exhaustion of administrative remedies. Under 10 C.F.R. Sec. 2.206(a) any person may request that NRC institute a proceeding to "modify, suspend or revoke a license, or for such other action as may be proper." The City could have petitioned NRC to expedite the licensing proceeding and the EIS process. If the petition were denied, 10 C.F.R. Sec. 2.206(b), that final order would be appealable to this Court, rather than the district court. Rockford League of Women Voters v. NRC, 679 F.2d 1218, 1219-1221 (7th Cir.1982); see also Justice Rehnquist's dissent from the denial of certiorari, General Pub. Utilities Corp. v. Susquehanna Valley Alliance, 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824. Consequently the district court properly dismissed Counts I-IV.
 
 
 63
 The orders under review in Nos. 82-1575 and 82-1684 are affirmed.
 
 
 
 *
 The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation
 
 
 [1]
 "Source material" is defined in Section 11 of the Atomic Energy Act, 42 U.S.C. Sec. 2014(z), as "(1) uranium, thorium, or any other material which is determined by the Commission pursuant to the provisions of section 2091 of this title to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time." The waste material on site would be considered either source material or "byproduct material," defined as "(1) any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material, and (2) the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." Id. Sec. 2014(e)
 
 
 [2]
 Sec. 189(a). Hearings and judicial review
 (a) In any proceeding under this chapter, for the granting, suspending, revoking, or amending of any license or construction permit, or application to transfer control, and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees, and in any proceeding for the payment of compensation, an award or royalties under sections 2183, 2187, 2236(c) or 2238 of this title, the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding. The Commission shall hold a hearing after thirty days' notice and publication once in the Federal Register, on each application under section 2133 or 2134(b) of this title for a construction permit for a facility, and on any application under section 2134(c) of this title for a construction permit for a testing facility. In cases where such a construction permit has been issued following the holding of such a hearing, the Commission may, in the absence of a request therefor by any person whose interest may be affected, issue an operating license or an amendment to a construction permit or an amendment to an operating license without a hearing, but upon thirty days' notice and publication once in the Federal Register of its intent to do so. The Commission may dispense with such thirty days' notice and publication with respect to any application for an amendment to a construction permit or an amendment to an operating license upon a determination by the Commission that the amendment involves no significant hazards consideration.
 (b) Any final order entered in any proceeding of the kind specified in subsection (a) of this section shall be subject to judicial review in the manner prescribed in the Act of December 29, 1950, as amended, and to the provisions of section 10 of the Administrative Procedure Act, as amended.
 
 
 [3]
 Despite the language of Section 189(a), see supra note 2, the NRC argued in the district court that there were some license amendments which could be issued without any kind of hearing; in fact, without any public notice at all. Response of Defendant Nuclear Regulatory Commission to the Court's October 15, 1981, Request for Briefing, Record Doc. No. 15 at 12-15. Agency practice is to avoid automatic publication in the Federal Register of every materials licensing action and instead to publish prior notice only when there is a potential for significant impact on the public health or safety or the environment. If there is an expression of public interest concerning an NRC action with insignificant impact the staff will compile a distribution list and forward relevant documents. Id. at 14-15. The district court ruled from the bench that the Commission must give prior notice of a materials license amendment even though the Commission staff has determined that the amendment would have no significant impact. City of West Chicago v. NRC, No. 81 C 5743, Tr. at 51 (October 21, 1981). Notice in this case was given pursuant to the district court's order, which was not appealed. Consequently we need not review the district court's interpretation of the statutory notice requirement
 
 
 [4]
 Sec. 2.104 Notice of hearing
 (a) In the case of an application on which a hearing is required by the Act or this chapter, or in which the Commission finds that a hearing is required in the public interest, the Secretary will issue a notice of hearing to be published in the Federal Register as required by law at least fifteen (15) days, and in the case of an application concerning a construction permit for a facility of the type described in Sec. 50.21(b) or Sec. 50.22 of this chapter or a testing facility, at least thirty (30) days, prior to the date set for hearing in the notice * * *. The notice will state:
 (1) The time, place, and nature of the hearing and/or prehearing conference, if any;
 (2) The authority under which the hearing is to be held;
 (3) The matters of fact and law to be considered; and
 (4) The time within which answers to the notice shall be filed.
 Although we quote the 1982 regulations herein, we note that use of the 1981 regulations would not affect the outcome of this case.
 
 
 [5]
 Sec. 2.105 Notice of proposed action
 (a) If a hearing is not required by the Act or this chapter, and if the Commission has not found that a hearing is in the public interest, it will, prior to acting thereon, cause to be published in the Federal Register a notice of proposed action with respect to an application for:
 (1) A license for a facility;
 (2) A license for receipt of waste radioactive material from other persons for the purpose of commercial disposal by the waste disposal licensee; or
 (3) An amendment of a license specified in paragraph (a)(1) or (2) of this section and which involves a significant hazards consideration;
 (4) A license to receive and possess high-level radioactive waste at a geologic repository operations area pursuant to Part 60 of this chapter;
 * * *
 (6) Any other license or amendment as to which the Commission determines that an opportunity for a public hearing should be afforded.
 
 
 [6]
 The City briefly argues that NRC violated 10 C.F.R. Sec. 40.32(d) when it issued Amendment No. 3 without a finding that it would "not be inimical to the common defense and security" (Br. at 38). According to NRC, that Section is inapplicable here because KM's request does not concern import or export of nuclear materials. 15 NRC 239 n. 3. The City has not shown why NRC's construction of Sec. 40.32(d) is wrong
 
 
 [7]
 The parties agree that under the APA, all licensing proceedings are adjudications. 5 U.S.C. Secs. 551(6)-(7), (9)
 
 
 [8]
 The full text of the language in the Senate Report is as follows:
 Section 181 makes the provisions of the Administrative Procedure Act applicable to all agency actions of the Commission. Where publication of data involved in agency action is contrary to the national security and common defense, then identical secret procedures are required to be set up within the Commission. The Commission is required to grant a hearing to any party materially interested in any agency action.
 The reference to the APA in this excerpt apparently reflects a congressional concern that when classified information is relevant to a licensing proceeding, the agency set up parallel hearing procedures except to the extent necessary to prevent disclosure of sensitive data. 15 NRC at 247 n. 13.
 
 
 [9]
 Commissioner Bradford in his dissent herein questions the wisdom of treating "all materials licenses differently from power reactors." 15 NRC at 272 (emphasis in original). His fear is that a materials license could easily be for "a major reprocessing plant with large quantities of radioactivity, a fuel fabrication facility handling material that could be diverted for use in a nuclear bomb, or a facility for the storage or disposal of nuclear wastes." Id
 It should be noted, first, that some of these licensing situations fall under 10 C.F.R. Sec. 2.105, supra note 5, which triggers the formal hearing process. In addition, NRC is not prohibited from holding formal hearings; it may do so in its discretion, or when it finds a formal hearing would be in the public interest. Finally, though new developments in nuclear technology may raise issues of such grave public concern that formal hearings should be mandatory, this argument carries more weight with Congress than the courts.
 
 
 [10]
 Siegel v. AEC, 400 F.2d 778 (D.C.Cir.1968), addressed the meaning of the hearing requirement in the AEA in the context of rulemaking. The court abided by the "on the record" requirement of APA Section 553(c), holding that informal rulemaking was permissible under the AEA since there was no "on the record" requirement in Section 189. In dicta, the court approvingly indicated that the AEC uniformly held more formalized proceedings in adjudication. Id. at 785. We note that in a more recent opinion, the D.C. Circuit declined to rule on the nature of the hearing required by Section 189(a) in the context of a license amendment. Sholly v. NRC, 651 F.2d 780, certiorari granted, 451 U.S. 1016, 101 S.Ct. 3004, 69 L.Ed.2d 387 (1981)
 
 
 [11]
 Of course, if a formal adjudicatory hearing is mandated by the due process clause, the absence of the "on the record" requirement will not preclude application of the APA. Wong Yang Sung v. McGrath, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616; United States v. Independent Bulk Transport, Inc., 480 F.Supp. 474, 478 (S.D.N.Y.1979). See infra Part IIA-3
 
 
 [12]
 Because we hold that the AEA does not require a formal hearing in this case, we need not address the NRC contention that no hearing is required in the absence of a disputed issue of material fact even when the governing statute by its terms requires an "on the record" hearing. This apparently is the rule in the D.C. Circuit, e.g., General Motors Corp. v. FERC, 656 F.2d 791, 794-795 and n. 5 (1981); Independent Bankers Ass'n v. Board of Governors of the Federal Reserve Sys., 516 F.2d 1206, 1220-1221 and n. 57 (1975)
 
 
 [13]
 NRC argues that it made clear in a prior opinion that formal hearings were not mandated by statute; the City points to the same opinion and argues that it was limited to the regulatory and defense issues involved. We set forth the text of the pertinent footnote, In the Matter of Nuclear Fuel Services, Inc. (Erwin, Tennessee), 11 NRC 799, 802 n. 4 (1980):
 The use of the military function exception here makes it unnecessary for the Commission to address specifically the question whether section 189(a) of the Atomic Energy Act requires formal adjudicatory hearings in materials licensing cases as opposed to cases involving facilities, such as reactors. However the Commission notes that, as far as it is aware, there is no decision which holds that such hearings are required, at least in cases such as this dominated by regulatory and national defense policy issues.
 
 
 [14]
 Section 102 of NEPA, 42 U.S.C. Sec. 4332, provides:
 The Congress authorizes and directs that, to the fullest extent possible: (1) the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and (2) all agencies of the Federal Government shall--
 * * *
 (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--
 (i) the environmental impact of the proposed action,
 (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
 (iii) alternatives to the proposed action,
 (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
 (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.
 Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes * * *.
 
 
 [15]
 Although NEPA does not specify that an agency must follow notice and comment procedures when it makes the threshold decision not to publish an EIS, see Hanley v. Kleindienst, 471 F.2d 823, 835 (Hanly II) (2d Cir.1972), certiorari denied, 412 U.S. 908, 93 S.Ct. 2290, 36 L.Ed.2d 974, the Second Circuit has held that such notice and comment are nonetheless required, id. at 836. But see Como-Falcon Community Coalition v. United States Dept. of Labor, 609 F.2d 342, 345 (8th Cir.1979), certiorari denied, 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789. This Circuit apparently has not squarely confronted the issue
 
 
 [16]
 The City argues that the opportunity to comment was meaningless because it did not have access to the NRC staff analysis of the proposed activities under Amendment No. 3. NRC, on the other hand, claims that the analysis was part of the public record (NRC Br. at 38 n. 29). Either way, the City had access to the study as early as October 15, 1981, when it appeared in the record as an attachment to KM's response to the City's motion for a temporary restraining order (Verified Response of Defendant, Kerr-McGee Chemical Corporation, to the Motion for Temporary Restraining Order, Rec.Doc. No. 6, Exhibit B)
 
 
 [17]
 The absence of specific mention of the water and foam and the floor trench procedures in Amendment No. 3 does not mean they were not authorized by the amendment. KM used the floor trench system under Amendment No. 1 (Admin.Rec., Vol. 1, Doc. No. 14, App. C & D), and NRC approved its use when it granted Amendment No. 1 (Admin.Rec., Vol. 5, Doc. No. 5). In its request for Amendment No. 3, KM indicated that further demolition would be carried out in the same manner as in Amendment No. 1 (Admin.Rec., Vol. 6, Doc. No. 1). Although Amendment No. 3 and the relevant documents do not refer to the use of foam, the primary emphasis of the amendment is to insure dust abatement, not dust abatement by the use of water. The use of foam does not violate the terms of the amendment simply because it is not mentioned therein
 
 
 [18]
 The Supreme Court noted that, in the long run, subdividing projects would not necessarily have a detrimental environmental effect, 427 U.S. at 414 n. 26, 96 S.Ct. at 2732 n. 26:
 Nor is it necessary that petitioners always complete a comprehensive impact statement on all proposed actions in an appropriate region before approving any of the projects. As petitioners have emphasized, and respondents have not disputed, approval of one lease or mining plan does not commit the Secretary to approval of any others; nor, apparently, do single approvals by the other petitioners commit them to subsequent approvals. Thus, an agency could approve one pending project that is fully covered by an impact statement, then take into consideration the environmental effects of that existing project when preparing the comprehensive statement on the cumulative impact of the remaining proposals.
 
 
 [19]
 The Council on Environmental Quality (CEQ), created pursuant to NEPA, directed federal agencies to establish their own procedures to identify actions requiring an EIS. See 40 C.F.R. Sec. 1500.3. NRC has specified as a generic matter those activities that are subject to NEPA consideration in 10 C.F.R. Sec. 51.5(a)-(b). The materials license amendment falls under 10 C.F.R. Sec. 51.5(d) which provides that:
 an environmental impact statement, negative declaration, or environmental impact appraisal need not be prepared in connection with the following types of actions:
 * * *
 (4) Issuance of a materials license or amendment to or renewal of a materials or facility license or permit or order other than those covered by paragraphs (a) and (b) of this section.
 
 
 [20]
 We agree with the Third Circuit in Township of Lower Alloways Creek v. Public Serv. Elec. & Gas Co., 687 F.2d 732, 743 (3d Cir.1982):
 [P]araphrasing Vermont Yankee [Nuclear Power Corp. v. Natural Resources Defense Council, 435 U.S. 519, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978) ], we believe it is "incumbent upon [petitioners] who wish to [appeal a NEPA-related agency determination] to structure their participation so that it is meaningful, so that it alerts the [court] to the [petitioners'] position and contentions." 435 U.S. at 553 [98 S.Ct. at 1216]. Judges are neither scientists nor technicians; if judicial review of agency decisionmaking is to be productive and profitable, courts must insist that litigants provide them with sufficient information and analysis to assess critically the validity of the allegedly improper agency action.
 
 
 [21]
 Despite the admission in its brief, the City continues to argue that the district court had jurisdiction to review the claim of illegal segmentation under NEPA. Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor, 619 F.2d 231 (3d Cir.1980), certiorari denied sub nom. General Pub. Utilities Corp. v. Susquehanna Valley Alliance, 449 U.S. 1096, 101 S.Ct. 893, 66 L.Ed.2d 824. See supra at 650-652. Suffice it to say that as in this case, where final agency action brings an order within the ambit of 28 U.S.C. Sec. 2342(4), the district court has no concurrent jurisdiction with the court of appeals to review the order for NEPA compliance. City of Rochester v. Bond, 603 F.2d 927, 936 (D.C.Cir.1979). In Susquehanna, supra, the court was reviewing agency action that did not constitute a final order, and thus did not come within the exclusive review provisions of Section 2342(4). 619 F.2d at 241
 
 
 [22]
 The City also claims for the first time on appeal that NRC is required under NEPA to issue an EIS on the effect of maintenance of the site because maintenance constitutes major federal action with significant environmental effects. Because this allegation did not appear in the complaint and was not considered below, it will not be considered here